11 CIV 8471

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

IRON WORKERS MID-SOUTH PENSION
FUND, Derivatively on Behalf of THE BANK
OF NEW YORK MELLON CORPORATION,

              Plaintiff,

   v.

GERALD L. HASSELL, THOMAS P.
GIBBONS, ARTHUR CERTOSIMO, JAMES
P. PALERMO, WESLEY W. VON SCHACK,
CATHERINE A. REIN, RICHARD J.
KOGAN, WILLIAM C. RICHARDSON,
SAMUEL C. SCOTT III, MICHAEL J.
KOWALSKI, JOHN A. LUKE, JR., MARK
A. NORDENBERG, NICHOLAS M.
DONOFRIO, RUTH E. BRUCH, EDMUND
F. KELLY, JOHN P. SURMA, ROBERT P.
KELLY, and RICHARD MAHONEY,

              Defendants,

  -and-

THE BANK OF NEW YORK MELLON
CORPORATION, a Delaware corporation,

             Nominal Defendant.

-------------------------------------------------- X

Civil Action No.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS, AND UNJUST
ENRICHMENT



DEMAND FOR JURY TRIAL

"Pricing is an art, not a science."

~David Nichols, The Bank of New York Mellon Corporation Global Markets Managing Director

## SUMMARY OF THE CASE

    1.    This is a derivative action, brought by a shareholder of The Bank of New York Mellon Corporation ("BNY Mellon" or the "Company") on behalf of the Company, to remedy the harm wrought by BNY Mellon's faithless fiduciaries. These defendants' breaches of fiduciary duty have exposed the Company to billions in damages through multiple lawsuits brought by various states, agencies, and private plaintiffs. Plaintiff seeks redress for the

Company's faithless fiduciaries willingness to gamble BNY Mellon's most valuable asset, its reputation, in exchange for short term profits and to aggrandize their own positions. Plaintiff also seeks to hold BNY Mellon's fiduciaries accountable for their knowing breaches of duty to the Company by causing and allowing it to operate in violation of the law. Though involving complicated transactions and contracts, at its heart, this matter is simply about BNY Mellon lying to its customers, so that it, and through it, the Individual Defendants (as defined herein), could make, according to defendant Robert P. Kelly ("R. Kelly"), "bundles of cash."

2.     The lie at issue in this case is that BNY Mellon would execute foreign currency exchange transactions for its custodial clients "free of charge" and that it followed "best execution" standards. The Company, as a custodial bank, provides a variety of services to its clients, including foreign currency exchange. Clients can utilize the Company's foreign currency exchange services either through "negotiated" or "non-negotiated" transactions. In a negotiated transaction, the client or its representative negotiates a price for the for the foreign currency exchange trade directly with a BNY Mellon foreign currency exchange trader. Non-negotiated trades are completed via the Company's Standing Instruction Service on an as needed basis for custody related foreign currency exchanges, including securities trade settlement, income conversions (including dividends and bank interest), corporate actions, tax reclaims, interest postings, and residual balances.

3.     The Company described its Standing Instruction Service as free and "cost-effective." In addition, it said it followed "best execution" standards, which required BNY Mellon to extend every effort to obtain the best price for its clients. This was not the case. Rather than charging clients the prevailing foreign currency exchange rate, or some set amount above that rate, BNY Mellon would execute the trade at the market rate and then look at the high

and low exchange rates for that day and charge its client at or near the least favorable rate for the day. In doing so, the Company was able to keep the difference between the exchange rate the Company actually made the trade at on behalf of the client and the exchange rate that BNY Mellon charged the client. This markup, which remained hidden from clients, could reach over thirty basis points. In comparison, for negotiated transactions, the markup was only four basis points.

4.     BNY Mellon hid this markup from its clients.   Client account statements generally reported foreign currency exchange conversion rates that fell within the day's foreign currency exchange rates, though near the high or low depending on the transaction, but did not provide time-stamped execution prices.   Further, when a customer requested additional transparency into the foreign currency exchange trades, the Company would push that client into an alternative pricing structure, rather than keep them using the Standing Instruction Services and actually provide them with the transparency requested.   Indeed, according to e-mails released in related governmental litigation against the Company, the Company's employees and fiduciaries were aware that BNY Mellon would not be able to execute this scheme if its clients knew they were being charged such a high market on foreign currency trades.

5.     The scheme at the Company reached the highest levels of management.  An e-mail disclosed in related litigation revealed that defendant R. Kelly, then the Company's Chief Executive Officer ("CEO"), received a detailed explanation on how the Standing Instruction Service allowed BNY Mellon's traders to "time the currency execution in the marketplace knowing we don't have to get back to the customer immediately with the deal price. Business of this tuple also allows us to take advantage of increase market volatility and wide intra-day trading ranges."  R. Kelly was also aware of the need to hide these practices from the Company's

clients. That same e-mail stated, "All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved. (comparison pricing, execution, and confirmation in real time)."

6.     Amazingly, this secret and illegal foreign currency scam at BNY Mellon continued for over a decade. However, for the past two years, a lone whistleblower within the Company has worked with governmental agencies to shine the light on this scheme. As the truth about BNY Mellon's foreign currency exchange trading practices came to light, first, the Company was sued by a number of pension funds. Then, a number of states, including Virginia, New York, and Florida intervened in qui tam actions pending against the Company or sued BNY Mellon directly. . Next, the United States Attorney General and Massachusetts securities regulators sued BNY Mellon in separate actions. The New York lawsuit alone seeks $2 billion in damages. Finally, the Company is now the subject of a class action brought on behalf of BNY Mellon 401(k) savings plan participants, alleging that the Company and the plan's fiduciaries breached their duty to the plan's beneficiaries. Plaintiff now seeks to hold the Company's disloyal fiduciaries accountable for the harm they have and are causing BNY Mellon.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to BNY Mellon occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

10.     Plaintiff Iron Workers Mid-South Pension Fund was a shareholder of BNY Mellon at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current BNY Mellon shareholder.   Plaintiff is a citizen of Oklahoma, Louisiana, Mississippi, and Texas.

**Nominal Defendant**

11.     Nominal defendant BNY Mellon is a Delaware corporation with its principal executive offices located at One Wall Street, New York, New York. BNY Mellon is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder

derivative action is on its behalf. BNY Mellon is a financial services company that provides various products and services worldwide.

**Defendants**

12.　Defendant Gerald L. Hassell ("Hassell") is BNY Mellon's CEO and Chairman of the Board of Directors (the "Board") and has been since August 2011. Hassell is also BNY Mellon's President and a director and has been since 2007. Hassell was President and a director of The Bank of New York Company, Inc. ("Bank of New York Co."), a predecessor of BNY Mellon, and President of The Bank of New York, Bank of New York Co.'s principal banking subsidiary, from 1998 to 2007. Hassell also served in various other executive positions at Bank of New York Co. and The Bank of New York from 1990 to 2007, including a Senior Executive Vice President, Chief Commercial Banking Officer, and an Executive Vice President. Hassell knowingly, recklessly, or with gross negligence was unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Hassell knowingly breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Hassell knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Hassell the following compensation as an executive:

- 6 -

| Year | Salary | Bonus | Value of Performance Shares Earned | Other Annual Compensation | Stock Awards | Option Awards | Securities Underlying Options | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|-----------------------------------|---------------------------|--------------|---------------|------------------------------|----------------------------------------|--------------------------------------------------------------------------|------------------------|-------|
| 2010 | $800,000 | - | - | - | $2,709,251 | $2,679,949 | - | $3,272,500 | $1,506,276 | $211,126 | $11,179,102 |
| 2009 | $800,000 | $1,531,250 | - | - | $1,663,282 | $1,423,842 | - | - | $754,783 | $221,107 | $6,394,264 |
| 2008 | $818,462 | - | - | - | $1,521,608 | $3,736,786 | - | - | $1,138,632 | $218,197 | $7,433,685 |
| 2007 | $800,000 | $1,839,000 | - | - | $5,099,001 | $7,869,408 | - | $3,411,000 | $773,913 | $234,545 | $20,026,867 |
| 2006 | $800,000 | $1,075,000 | - | - | $2,754,400 | $766,600 | - | $3,279,000 | $881,000 | $236,700 | $9,792,700 |
| 2005 | $800,000 | $2,100,000 | $3,179,904 | $160,495 | - | - | - | - | - | $44,480 | $8,284,879 |
| 2004 | $800,000 | $2,000,000 | $3,890,088 | $154,770 | - | - | 175,000 | - | - | $44,256 | $6,889,114 |
| 2003 | $696,153 | $2,411,000 | $5,087,232 | $160,848 | $1,599,000 | - | 375,000 | - | - | $37,550 | $9,991,783 |
| 2002 | $650,000 | - | $356,405 | - | $460,224 | - | 375,000 | - | - | $35,013 | $1,501,642 |
| 2001 | $650,000 | $560,000 | $3,266,570 | - | - | - | 250,000 | - | - | $89,293 | $4,585,863 |
| 2000 | $546,154 | $1,400,000 | $5,311,797 | - | - | - | 250,000 | - | - | $93,926 | $7,351,877 |

Hassell is a citizen of New York.

13.     Defendant Thomas P. Gibbons ("Gibbons") is BNY Mellon's Chief Financial Officer ("CFO") and has been since July 2008 and a Vice Chairman and has been since September 2010. Gibbons is also a Vice Chairman and CFO of BNY Mellon, National Association ("BNY Mellon, N.A."), a principal banking subsidiary of BNY Mellon. Gibbons was BNY Mellon's Chief Risk Officer from July 2007 to July 2008. Gibbons was also Bank of New York Co.'s CFO from September 2006 to June 2007; a Senior Executive Vice President from April 2005 to June 2007; Chief Risk Officer from at least 2005 to 2006; and an Executive Vice President from at least 2002 to 2005. Gibbons knowingly, recklessly, or with gross negligence was unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Gibbons also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Gibbons knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency

exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Gibbons the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| 2010 | $650,000 | - | $1,641,184 | $1,623,424 | $2,050,000 | $636,918 | $170,714 | $6,772,240 |
| 2009 | $650,000 | $1,200,000 | $920,101 | $787,657 | - | $334,965 | $165,418 | $4,058,141 |
| 2008 | $651,923 | - | $736,537 | $2,149,927 | - | $338,629 | $173,604 | $4,050,620 |
| 2006 | $625,000 | $1,166,000 | $1,889,100 | $823,400 | $799,000 | $8,500 | $113,500 | $5,424,500 |

Gibbons is a citizen of New Jersey.

14.     Defendant Arthur Certosimo ("Certosimo") is BNY Mellon's CEO, Global Markets and has been since May 2011, and a Senior Executive Vice President and has been since March 2009. Certosimo is also a Senior Executive Vice President of BNY Mellon, N.A. Certosimo was BNY Mellon's CEO of Alternative, Broker Dealer, and Treasury Services from at least June 2009 to May 2011, and an Executive Vice President from July 2007 to May 2009. Certosimo was also Bank of New York Co.'s head of Broker Dealer Services and Alternative Investment Services and an Executive Vice President from at least 2003 to 2007. Certosimo knowingly, recklessly, or with gross negligence was unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Certosimo also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Certosimo is a citizen of New Jersey.

15.     Defendant James P. Palermo ("Palermo") is BNY Mellon's CEO of Global Client Management and Liquidity Services and has been since September 2010, and a Vice Chairman

and has been since at least February 2008. Palermo is also a Vice Chairman of BNY Mellon, N.A. Palermo was head of BNY Mellon's Global Markets Business from 2010 to 2011, and head of the Asset Servicing Business from 2007 to 2010. Palermo was also head of Asset Servicing at Mellon Financial Corporation ("Mellon"), a predecessor of BNY Mellon, from 1998 to 2007, and Vice Chairman of Mellon and Mellon Bank, N.A, Mellon's banking subsidiary, from 2002 to 2007. Palermo knowingly, recklessly, or with gross negligence was unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Palermo also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Palermo knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. Palermo is a citizen of Massachusetts.

16.     Defendant Wesley W. von Schack ("von Schack") is a BNY Mellon director and has been since July 2007. von Schack was also a Mellon director from 1989 to 2007. von Schack was BNY Mellon's Lead Director from January 2009 to at least March 2011. von Schack is also a member of BNY Mellon's Risk Committee and has been since July 2007. von Schack either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. von Schack also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the

Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. von Schack knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid von Schack the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|-------------------|--------------|---------------|------------------------------------------------------------------------|------------------------|-------|
| 2010 | $138,274 | $109,969 | - | $35,994 | $2,800 | $287,037 |
| 2009 | $134,305 | $109,978 | - | $32,072 | $2,471 | $278,826 |
| 2008 | $125,000 | $102,087 | - | $14,593 | $2,174 | $243,854 |
| 2007 | $57,550 | $42,956 | - | $8,664 | $954 | $110,124 |
| 2006 | $135,500 | $59,782 | $5,878 | $139,698 | $1,654 | $342,512 |

von Schack is a citizen of Maine.

17.    Defendant Catherine A. Rein ("Rein") is a BNY Mellon director and has been since July 2007. Rein was also a Bank of New York Co. director from 1981 to 2007. Rein was BNY Mellon's Lead Director from at least March 2008 to December 2008. Rein is also Chairman of BNY Mellon's Audit Committee and has been since July 2007. Rein either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Rein also breached her duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Rein knowingly or recklessly made improper statements in the Company's public filings concerning the Company's

Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Rein the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|-------------------|--------------|-------------------------------------------------------------------------|------------------------|-------|
| 2010 | $122,400 | $109,969 | $25,872 | $970 | $259,211 |
| 2009 | $126,000 | $109,978 | $18,240 | $1,351 | $255,569 |
| 2008 | $128,500 | $76,527 | $17,433 | - | $222,460 |
| 2007 | $58,950 | - | - | $2,404 | $61,354 |
| 2006 | $135,200 | $99,993 | - | - | $235,193 |

Rein is a citizen of New York.

18.     Defendant Richard J. Kogan ("Kogan") is a BNY Mellon director and has been since July 2007. Kogan was also a Bank of New York Co. director from 1996 to 2007. Kogan is a member of BNY Mellon's Audit Committee and has been since at least March 2010. Kogan either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Kogan also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Kogan knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Kogan the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2010 | $127,200 | $109,969 | $237,169 |
| 2009 | $120,000 | $109,978 | $229,978 |
| 2008 | $98,100 | $76,527 | $174,627 |
| 2007 | $44,100 | - | $44,100 |
| 2006 | $111,400 | $99,993 | $211,393 |

Kogan is a citizen of New Jersey.

19.    Defendant William C. Richardson ("Richardson") is a BNY Mellon director and has been since July 2007. Richardson was also a Bank of New York Co. director from 1998 to 2007. Richardson is a member of BNY Mellon's Audit Committee and has been since July 2007. Richardson either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Richardson also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Richardson knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Richardson the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2010 | $117,725 | $109,969 | $451 | $228,145 |
| 2009 | $139,024 | $109,978 | - | $249,002 |
| 2008 | $112,500 | $76,527 | - | $189,027 |
| 2007 | $58,500 | - | $567 | $59,067 |
| 2006 | $123,800 | $99,993 | - | $223,793 |

Richardson is a citizen of Michigan.

20.      Defendant Samuel C. Scott III ("Scott") is a BNY Mellon director and has been since July 2007. Scott was also a Bank of New York Co. director from 2003 to 2007. Scott is a member of BNY Mellon's Audit Committee and has been since July 2007. Scott either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Scott also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Scott knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Scott the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2010 | $125,400 | $109,969 | $247 | $235,616 |
| 2009 | $116,400 | $109,978 | $343 | $226,721 |
| 2008 | $128,700 | $76,527 | - | $205,227 |
| 2007 | $45,900 | - | $310 | $46,210 |
| 2006 | $108,000 | $99,993 | - | $207,993 |

Scott is a citizen of Illinois.

21.      Defendant Michael J. Kowalski ("Kowalski") is a BNY Mellon director and has been since July 2007. Kowalski was also a Bank of New York Co. director from 2003 to 2007. Kowalski is a member of BNY Mellon's Audit Committee and has been since at least November 2011. Kowalski was also a member of BNY Mellon's Risk Committee from July 2007 to at least March 2011. Kowalski either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Kowalski also

breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Kowalski knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Kowalski the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2010 | $96,600 | $109,969 | $247 | $206,816 |
| 2009 | $107,400 | $109,978 | $343 | $217,721 |
| 2008 | $92,700 | $76,527 | - | $169,227 |
| 2007 | $31,050 | - | $310 | $31,360 |
| 2006 | $102,000 | $99,993 | - | $201,993 |

Kowalski is a citizen of New Jersey.

22.     Defendant John A. Luke, Jr. ("Luke") is a BNY Mellon director and has been since July 2007. Luke was also a Bank of New York Co. director from 1996 to 2007. Luke is a member of BNY Mellon's Risk Committee and has been since July 2007. Luke either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Luke also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Luke knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose

that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services.  BNY Mellon paid Luke the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $109,100 | $109,969 | $219,069 |
| 2009 | $114,500 | $109,978 | $224,478 |
| 2008 | $103,400 | $76,527 | $179,927 |
| 2007 | $47,850 | - | $47,850 |
| 2006 | $109,400 | $99,993 | $209,393 |

Luke is a citizen of Virginia.

23.     Defendant Mark A. Nordenberg ("Nordenberg") is a BNY Mellon director and has been since July 2007.  Nordenberg was also a Mellon director from 1998 to 2007. Nordenberg is a member of BNY Mellon's Risk Committee and has been since July 2007. Nordenberg either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it.  Nordenberg also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Nordenberg knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Nordenberg the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|-------------------|--------------|---------------|------------------------------------------------------------------------|------------------------|-------|
| 2010 | $96,600 | $109,969 | - | $2,920 | $1,670 | $211,159 |
| 2009 | $111,000 | $109,978 | - | $5,381 | $1,461 | $227,820 |
| 2008 | $96,300 | $102,087 | - | $2,448 | $1,278 | $202,113 |
| 2007 | $36,900 | $42,956 | - | $1,431 | $560 | $81,847 |
| 2006 | $111,625 | $59,782 | $5,878 | $18,724 | $5,974 | $201,983 |

Nordenberg is a citizen of Pennsylvania.

24.    Defendant Nicholas M. Donofrio ("Donofrio") is a BNY Mellon director and has been since July 2007. Donofrio was also a Bank of New York Co. director from 1999 to 2007. Donofrio is Chairman of BNY Mellon's Risk Committee and has been since July 2007. Donofrio either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Donofrio also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Donofrio knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Donofrio the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2010 | $100,100 | $109,969 | $451 | $210,520 |
| 2009 | $103,700 | $109,978 | $627 | $214,305 |
| 2008 | $114,200 | $76,527 | - | $190,727 |
| 2007 | $48,650 | - | $567 | $49,217 |
| 2006 | $98,000 | $99,993 | - | $197,993 |

Donofrio is a citizen of Connecticut.

25.    Defendant Ruth E. Bruch ("Bruch") is a BNY Mellon director and has been since July 2007. Bruch was also a Mellon director from 2003 to 2007. Bruch is a member of BNY Mellon's Risk Committee and has been since at least May 2009. Bruch either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Bruch also breached her duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Bruch knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid Bruch the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| 2010 | $128,900 | $109,969 | - | $238,869 |
| 2009 | $127,100 | $109,978 | - | $237,078 |
| 2008 | $118,350 | $102,087 | - | $220,437 |
| 2007 | $52,700 | $42,956 | - | $95,656 |
| 2006 | $96,000 | $59,782 | $5,878 | $161,660 |

Bruch is a citizen of Illinois.

26.    Defendant Edmund F. Kelly ("E. Kelly") is a BNY Mellon director and has been since July 2007. E. Kelly was also a Mellon director from 2004 to 2007. E. Kelly is a member of BNY Mellon's Risk Committee and has been since July 2007. E. Kelly either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. E. Kelly also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to

such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. E. Kelly knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services. BNY Mellon paid E. Kelly the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| 2010 | $107,400 | $109,969 | - | $217,369 |
| 2009 | $105,600 | $109,978 | - | $215,578 |
| 2008 | $103,500 | $102,087 | - | $205,587 |
| 2007 | $45,900 | $42,956 | - | $88,856 |
| 2006 | $97,500 | $59,782 | $5,878 | $163,160 |

E. Kelly is a citizen of Massachusetts.

27.    Defendant John P. Surma ("Surma") is a BNY Mellon director and has been since July 2007. Surma was also a Mellon director from 2004 to 2007. Surma is a member of BNY Mellon's Audit Committee and has been since July 2007. Surma either knew or was recklessly unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. Surma also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. Surma knowingly or recklessly made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging

investors using the Standing Instruction Services.  BNY Mellon paid Surma the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|-----|-----|-----|-----|-----|-----|
| 2010 | $109,200 | $109,969 | - | $4,533 | $769 | $224,471 |
| 2009 | $105,600 | $109,978 | - | $4,039 | $688 | $220,305 |
| 2008 | $108,900 | $102,087 | - | $1,838 | $619 | $213,444 |
| 2007 | $49,500 | $42,956 | - | $1,062 | $281 | $93,799 |
| 2006 | $133,750 | $59,782 | $5,878 | $12,447 | $5,000 | $216,857 |

Surma is a citizen of Pennsylvania.

28.  Defendant R. Kelly was BNY Mellon's CEO from 2007 to August 2011; Chairman of the Board from July 2008 to August 2011; and a director from July 2007 to August 2011. R. Kelly also served as Chairman and CEO of BNY Mellon, N.A. R. Kelly was a Mellon director from 2006 to 2007. R. Kelly knowingly, recklessly, or with gross negligence was unaware about BNY Mellon's illegal foreign currency exchange scheme and explicitly or tacitly approved of it. R. Kelly also breached his duty of loyalty by instilling blatantly inadequate internal controls at the Company and failing to monitor the Company's operations to such a degree that BNY Mellon's employees were able to complete a decade long scheme to mislead the Company's clients and overcharge them billions of dollars. R. Kelly knowingly, recklessly, or with gross negligence made improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and foreign currency exchange trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services.  BNY Mellon paid R. Kelly the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| 2010 | $1,000,000 | - | $7,516,705 | $4,896,057 | $5,610,000 | - | $356,495 | $19,379,257 |
| 2009 | $1,000,000 | - | $4,929,467 | $5,004,484 | | $2,815,326 | $297,158 | $14,046,435 |
| 2008 | $993,750 | - | $3,075,634 | $7,553,082 | - | $2,221,054 | $340,113 | $14,183,633 |
| 2007 | $975,000 | $7,500,000 | $4,214,650 | $6,164,933 | - | $4,286,296 | $1,661,227 | $24,802,106 |
| 2006 | $864,205 | $5,000,000 | $2,898,462 | $649,973 | - | $6,135,191 | $937,977 | $16,485,808 |

R. Kelly is a citizen of New York.

29.     Defendant Richard Mahoney ("Mahoney") was BNY Mellon's CEO, Global Markets and an Executive Vice President from 2007 to June 2011. Mahoney was also CEO, Global Markets and an Executive Vice President of Bank of New York Co. from at least 2000 to 2007. Mahoney knowingly implemented the Company's illegal foreign currency exchange scheme. Mahoney is a citizen of New York.

30.     The defendants identified in ¶¶12-15, 28-29 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶12, 16-28 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17-21, 27 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶16, 21-26 are referred to herein as the "Risk Committee Defendants." Collectively, the defendants identified in ¶¶12-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers, directors, and/or fiduciaries of BNY Mellon and because of their ability to control the business and corporate affairs of BNY Mellon, the Individual Defendants owed and owe BNY Mellon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BNY Mellon in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of BNY Mellon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32. Each officer and director of the Company owes to BNY Mellon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

**Additional Duties of the Audit Committee Defendants**

33. In addition to these general fiduciary duties, under the Audit Committee's Charter, the Audit Committee Defendants, Kogan, Kowalski, Rein, Richardson, Scott, and Surma, owed specific duties to BNY Mellon to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements. In addition, the Audit Committee members were charged with overseeing the Company's compliance with legal and regulatory requirements.

**Additional Duties of the Risk Committee Defendants**

34. In addition to these general fiduciary duties, under the Risk Committee's Charter, the Risk Committee Defendants, Bruch, Donofrio, E. Kelly, Kowalski, Luke, Nordenberg, and von Schack, owed specific duties to BNY Mellon to oversee the Company's fiduciary business, including "review[ing] reports on fiduciary activities of the Corporation's businesses."

**Control, Access, and Authority**

35. The Individual Defendants, because of their positions of control and authority as officers and/or directors of BNY Mellon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

36. Because of their advisory, executive, managerial, and directorial positions with BNY Mellon, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of BNY Mellon. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding the fees BNY Mellon charges for its foreign currency exchange services and the prudence of investing in the Company.

37. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BNY Mellon, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

38. To discharge their duties, the officers and directors of BNY Mellon were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of BNY Mellon were required to, among other things:

(a) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b) ensure that the Company complied with its legal obligations and requirements;

(c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how BNY Mellon conducted its operations, and, upon receipt of notice or information of illegal, imprudent, or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of BNY Mellon, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of BNY Mellon's Board.

40.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in the illegal foreign currency exchange scheme detailed herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of a

numerous lawsuits.  As a result, BNY Mellon has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

43.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully mislead its clients about how it charged them for foreign currency exchanges.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

47.     In July 2007, Mellon Financial Corporation and The Bank of New York Company, Inc. merged to create, BNY Mellon.  BNY Mellon is the world's largest global custodian bank.  A custodian bank is a financial institution that holds and safeguards financial assets of firms and individuals, such as stocks, bonds, and currency.

48.     Many of BNY Mellon's customers invest in foreign securities which are required to be purchased and sold in the currencies of the countries where the securities are issued.  Therefore, in order to execute these investments, BNY Mellon's clients must first change their U.S. currency into the foreign currency when purchasing the security and vice versa when selling the security.  In addition, these foreign securities can earn income in the foreign currency (such as a dividend), which BNY Mellon's clients will often choose to repatriate.

49.     BNY Mellon generally offered its customers two methods to exchange currency: (i) negotiated rates; and (ii) Standing Instruction Service.  As the name implies, a negotiated rate involved a client or its investment manager negotiating directly with BNY Mellon's foreign currency exchange traders to purchase or sell currency.  Standing Instruction Service is conducted on a non-negotiated basis, automatically conducted on an as needed basis pursuant to a standing authorization, with BNY Mellon determining the exchange rate.

50.     Foreign currency exchange revenue falls under the Company's Asset Serving section. The Company, in its annual statements, reported almost $800 million in revenue in 2010 and $1 billion in revenue in 2009 for its Asset Servicing sector.

## THE ILLEGAL FOREIGN CURRENCY EXCHANGE TRADING SCHEME

**BNY Mellon Enticed Clients to Create Custodial Accounts Without Disclosing How It Priced Foreign Currency Exchange Trading**

51.     BNY Mellon's employees misled prospective customers, including its custodial clients and clients' investment managers, about its Standing Instruction Service. BNY Mellon continued to mislead its clients and omit pertinent information when seeking to retain the existing custodial relationships.

52.     BNY Mellon told its prospective clients that foreign currency exchange transactions done pursuant to the Standing Instruction Service would be executed according to "best execution" standards. Best execution standards would require BNY Mellon to obtain the best price available at the time of execution of the foreign currency exchange transaction. According to the *State of New York, ex rel. FX Analytics v. The Bank of New York Mellon Corporation* complaint (the "New York Complaint"), BNY Mellon employees were aware of the meaning of "best execution."   One internal e-mail at the Company stated that the industry definition of best execution was execution "to achieve the goal of maximizing the value of the client portfolio under [the] particular circumstances of the time."

53.     The Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts filed an administrative action against BNY Mellon that detailed some of the Company's many misrepresentations, including to the Massachusetts Pension Reserves Investment Management Board ("PRIM") (the "Massachusetts Complaint").

54.    As revealed in the Massachusetts Complaint, BNY Mellon's interactions with PRIM go back to 2002, when the Company responded to PRIM's request for proposal ("RFP"). At that time, BNY Mellon explained its foreign currency exchange capabilities as:

> *Foreign currency exchange Trading Desk.* Mellon operates full service trading rooms in London, Boston, and Pittsburgh providing 24-hour market access for our clients.    We have an extensive Foreign Exchange Division. We provide investment managers of our clients with access to one of the most competitive and efficient foreign exchange operations in the industry.
>
> *   *   *
>
> In addition to these services, Mellon [Global Securities Services] can accommodate standing instructions to convert and transfer specified currencies upon receipt. With such instructions in place, clients can avoid spending time and effort monitoring currency balances and issuing specific routine instructions.

55.    In addition, BNY Mellon provided the following description of its Standing Instruction Service to PRIM in both its January 2008 and November 2008 proposals responding to PRIM's RFPs for Master Custody Services.

> [A] simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign currency exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings and residual balances. Operationally simple, free of charge and integrated with the client's activity on the various securities markets, [foreign exchange] standing instruction is designed to help clients minimize risks and costs related to the foreign currency exchange and concentrate on their core businesses.

56.    Even after a custodial client relationship commenced as a result of the RFP process, BNY Mellon continued to omit material information from its marketing and client materials, including, for example, its Global Account Opening Documentation Package (which was attached as an exhibit to the Massachusetts Complaint).  BNY Mellon claimed that it would price foreign currency exchange transactions via the Standing Instruction Service "at a rate not less favorable than indicated on the *Daily Schedule* for that day."  In addition it claimed that the Standing Instruction Service included netting: "Currency purchases and sales effected pursuant

to [Foreign Exchange] Procedures in the same currency and having the same trade and value date may be netted for pricing purposes within a customer account." These statements were not true.

## BNY Mellon Uses Its Standing Instruction Service to Maximize Profits for the Bank

57.    BNY Mellon told its clients that Standing Instruction Service was "free of charge" and "cost-effective."   The Company, however, charged exorbitant markups to the foreign currency exchange transactions by cherry-picking exchanges that maximized its profit.  Further, the Company stated that it would execute Standing Instruction Service trades within a daily range.   The Massachusetts Complaint, however, revealed numerous instances where the Company executed trades outside the stated range.   Even for those trades that were executed within the range, the Company executed the trades at either the high or low of the range, whichever was more profitable for BNY Mellon.  None of this was disclosed to clients, in fact, it was actively hidden from them.  After a standing instruction foreign currency exchange trade has been executed, the only pricing information that BNY Mellon provides to clients is the final exchange rate assigned.

58.    The illegal foreign currency exchange scheme was deceptively simple.  Rather than charging clients the prevailing foreign currency exchange rate at the time of the actual transaction, BNY Mellon observed post-trade movements in the foreign currency exchange market rates and charged clients as if the trade had occurred at either the high of the day for purchases or the low of the day for sales.  In fact, according to the New York Complaint, BNY Mellon priced the Taiwan dollar at a rate higher than even the worst market rate, utilizing the artificial rate set by the Central Bank of China.  BNY Mellon then kept the difference between the price actually paid for the currency and the price charged to its client.  The more volatility in the foreign currency exchange market the greater the spread and therefore the greater the potential profit to BNY Mellon.  Therefore, during the credit crisis in 2008, when unprecedented

volatility occurred in the market, BNY Mellon was able to make tremendous gains by over-charging its clients. In fact, using the Standing Instruction Service, BNY Mellon was able to markup prices over thirty basis points, compared to only four basis points applied to transparently negotiated trades.

59.    The highest levels of management at BNY Mellon knew about and, at a minimum, tacitly approved of this deceptive scheme. In a February 2008 from Jorge Rodriguez, head of Global Markets Foreign Exchange Sales, to his superior, defendant Mahoney, Mr. Rodriguez explained how Standing Instruction Service allows BNY Mellon to take advantage of the daily spread in foreign currency exchange prices:

> As we all know, Standing Instruction [Service] is the most profitable form of business. It *offers the traders a free intra-day option to time its currency execution in the marketplace* knowing it does not have to get back to the customer immediately with the deal price. Business of this type also allows us to *take advantage of increased market volatility and wide intra-day trading ranges.* All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved. Based on our actual records, in 2007, non-negotiated business generated an average profit of 9 basis points.

60.    Defendant Mahoney repackaged this information to defendant R. Kelly in an e-mail on February 1, 2008. In the e-mail, defendant Mahoney explained "Standing instruction also offers the traders a free intra-day option to time the currency execution in the marketplace knowing we don't have to get back to the customer immediately with the deal price. Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges."

61.    In addition, defendant Mahoney explained to defendant R. Kelly in the February 2008 e-mail that transparency with the customers regarding timing of foreign currency exchange transactions would destroy BNY Mellon's advantage, explaining "All these pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved.

(comparison pricing, execution, and confirmation in real time.)."  One e-mail from a BNY Mellon employee specifically noted that "[i]n general **transparency adversely impacts our revenue stream** and any product to distribute fee information would hurt us many times over in reduced revenue. Nothing like a rock and a hard place."

## IMPROPER STATEMENTS

62.     As explained above, due to the Individuals Defendants' action (or lack thereof) BNY Mellon realized significant illegal and improper profits from manipulating its clients by charging them the less favorable currency exchange rates than BNY Mellon was actually charged.  To conceal this practice, BNY Mellon not only lied to clients, but also its investors.

63.     BNY Mellon's officers and directors repeatedly issued improper statements that failed to disclose that BNY Mellon had engaged and was engaging in a systematic business practice of overcharging clients for foreign currency exchanges.

64.     In a press release issued by BNY Mellon on October 18, 2007, BNY Mellon reported foreign currency exchange trading and "other trading" revenue of $238 million for third quarter 2007, up 74% year-over-year reflecting "higher client volumes, as well as a significant increase in currency volatility and a higher valuation of the credit derivatives portfolio."

65.     Also on October 18, 2007, BNY Mellon held a 2007 earnings conference call, during which defendant Hassell made the following improper statements:

**Gerald L. Hassell** – *The Bank of New York Mellon Corporation - President*

I want to say how pleased we are about how we've come together as a new company, and our performance has been excellent. Our integration is on track, and at the same time we're posting strong growth in all of our businesses. Securities servicing fees in the aggregate were up 31% year-over-year, *led by asset servicing*, depositary receipts and corporate trust. Plus, we had a strong deposit flow in net interest income from these businesses that Bruce will speak to in a minute.

I know an area of great interest to you is *asset servicing*. There have been a few skeptics out there who have wondered if we could go through an integration and simultaneously grow our business. *Well, the marketplace and our clients are responding very favorably to our new company's offering and the excellent service we are providing them*, we have won 41 of 82 publicly announced new business wins in January through June, equaling the total of all competitors combined.

\* \* \*

**Bruce W. Van Saun** – *The Bank of New York Mellon Corporation – CFO*

\* \* \*

*[Foreign exchange] and other trading showed excellent growth, year-over-year and sequentially. [Foreign exchange] volatility and volumes were way up given the market conditions and we capitalized*. To a much smaller degree we also benefited from the higher value of our credit derivatives portfolio.

66.     On January 17, 2008, BNY Mellon issued a press release reporting its financial results for the fourth quarter of 2007. For the quarter, BNY Mellon reported foreign currency exchange trading and "other trading" revenue of $305 million, up 97% from the same period of 2006. In the press release, BNY Mellon described the fourth quarter increase in foreign currency exchange trading revenue as reflecting, "higher client volumes, a significant increase in currency volatility, as well as a higher valuation of the credit derivatives portfolio."

67.     On that same day, BNY Mellon held a fourth quarter 2007 earnings conference call.  During the conference call, defendants R. Kelly, Hassell, and Palermo made the following improper statements:

**Robert P. Kelly** - *The Bank of New York Mellon Corporation – CEO*

\* \* \*

Bruce [W. Van Saun] is going to provide greater details into the numbers as well as our excellent progress integrating our two legacy companies, but first, I'm going to ask Gerald to make some more specific comments about our revenue momentum *and some continued good news regarding the performance of our asset servicing business*. Gerald?

**Gerald L. Hassell** - *The Bank of New York Mellon Corporation – President*

Thanks Bob.

We've now delivered two strong quarters across all of our businesses, a great start for our new company. We're winning new business, we're retaining our client's, pipelines are in excellent shape and *we're delivering on our commitment to service quality*. We're experiencing excellent momentum all around, going into 2008. *For 2007, security servicing and Asset Management fees, our major sources of revenue, each enjoyed strong growth over the year-ago quarter.* Asset and wealth management fees were up 14% year-over-year and *security servicing fees were up 26% year-over-year. Led by asset servicing, which had an outstanding fourth quarter. Total revenues in this sector were up 42% with fees up 37%, [foreign exchange] and trading income up 89%, and net interest revenue up 46%. These results compare quite favorably to our peer group and were powered not only by market volatility but also by increased client activity, deposit flows and of course excellent new business results.*

\*  \*  \*

*In asset servicing, we are particularly mindful of how we are performing given the integration that we're going through.*

*I'm very pleased to report that in a recently released Global Custodian survey, our new combined company received nine top rated awards in key categories and 130 Best-in-Class awards, which is more than any other service provider. We're off to a great start to achieve our goal of number one rankings in all the major industry surveys, and we're going to continue to work hard on delivering great service to our clients.* On the revenue synergy front, on our last call we shared our revenue synergy goals of [$]250 to $400 million in incremental new revenue in 2011. We are meeting our interim targets and synergies achieved to date have come from a few key activities. Our proprietary mutual funds have now captured about 24% of client money market flows from our various businesses up from 15% at the end of '06.

*Our [foreign exchange] and securities lending desk have come together quite nicely, adopting a number of best practices and achieving good synergies.* Of course we're affectively cross-selling our expanded Asset Management capabilities, to our Asset Servicing clients.

\*  \*  \*

**Bruce W. Van Saun** - *The Bank of New York Mellon Corporation – CFO*

\*  \*  \*

*[Foreign exchange] and other trading had a stellar quarter, up 97% year-over-year, and 28% sequentially, reflecting market volatility and volumes, as well as an increase in value in our credit derivatives portfolio given credit spread widening.*

\* \* \*

I'm going to conclude my remarks by offering a few observations about the coming year. We are confident of momentum and positioning of our franchise as we enter '08. *In terms of how to think about us going forward, our servicing businesses are over-earning their trend line today, given market volumes and volatility, particularly in securities lending, FX and net interest income.* A key question for 2008 is how long will these favorable conditions last? That's a tough one, but what I can tell you is that the variables that we can control, such as service quality and net new business, continue to be in great shape."

\* \* \*

**James P. Palermo** - *The Bank of New York Mellon Corporation —Co-CEO-BNY Asset Servicing*

Brian what we were able to accomplish in the later half of '07 was actually consolidating both the debts. I think we realized the synergy components of that and now we're actually through the balance of '08 and I think it will be in the September, October time frame, we're working on the applications being integrated as well. So we'll get a little bit of a positive impact at that point. *But in terms of the best practices from a trading and lending perspective, those have already - pretty much already in the run rate.*

68.     On February 28, 2008, BNY Mellon filed its Form 10-K with the U.S. Securities

and Exchange Commission ("SEC") for the fiscal year 2007.  In the Form 10-K, defendants R.

Kelly, Bruch, Donofrio, Hassell,   E. Kelly, Kogan, Kowalski, Luke, Nordenberg, Rein,

Richardson, Scott, Surma, and von Schack stated:

> *[F]oreign exchange and other trading activities revenue, which is primarily reported in the Asset Servicing segment, was $786 million in 2007, an increase of $371 million, or 89%, compared with 2006.* The increase was due to the merger with Mellon, record customer volumes due to increased activity of the existing client base, new clients, and the favorable impact that resulted from increased currency volatility in the second half of 2007. Other trading activities increased reflecting a higher valuation of the credit derivative portfolio caused by the widening of credit spreads.

69.     On April 17, 2008, BNY Mellon issued a press release reporting foreign currency

exchange trading and "other trading" revenue of $259 million for the first quarter of 2008. In

highlighting the fact that this number was a 42% year-over-year increase, BNY Mellon announced that:

> *"Our businesses are performing well in a tough environment*. We generated 14% revenue growth compared to the first quarter of 2007, significant positive operating leverage and 16% [earnings per share] growth. Market volumes and volatility, together with new business wins, *continued to favor our asset servicing* and clearing businesses, while lower market values impacted our asset management business. Our progress on the merger and integration continues to be excellent," said Robert P. Kelly, chief executive officer of The Bank of New York Mellon.

70.     That same day, BNY Mellon held a first quarter 2008 earnings conference call, during which defendants R. Kelly and Hassell made the following improper statements:

**Robert P. Kelly** – *The Bank of New York Mellon Corporation – CEO*

* * *

You should assume that we will continue to sharpen our focus in the coming quarters.

One of the fundamental commitments we have made to our clients is industry-leading client service around the world in all of your businesses. I am delighted to advise that this further evidence we're succeeding on that front in most notably in asset servicing. Last quarter we told you about your number one performance in the global custodian survey. This quarter the results of the R&M global survey were released and we were again ranked number one amongst the world's largest global custodians, so we are consistently achieving our goal of outperforming our peers. Our success on the quality front is also paying off. In asset servicing during the quarter we won approximately $350 billion in new assets. This represents 60% success rate on the deals we bid on. In asset servicing our pipeline remains strong up over the prior quarter and this time last year, and we again exceeded client retention goals with the rate now well in excess of 99%.

* * *

**Ken Usdin** – *Bank of America Securities - Analyst*

And just can you give us anecdotes, are there tangible revenue synergies in this quarter?

**Gerald L. Hassell** – *The Bank of New York Mellon Corporation - President*

They are very similar to the ones we have seen in the past, and that is greater use and greater trading capabilities in our sect lending and foreign exchange areas.

Money flows out of areas like Pershing and our corporate trust areas into Dreyfus. Cross selling of asset management into our asset servicing clients. Those are the three main areas that continue to perform quite well.

71.     On June 17, 2008, BNY Mellon hosted its 2008 Investor Conference, during which defendant R. Kelly provided a presentation with a slide entitled "Strengths: Our Values and Behaviors."   During the presentation, R. Kelly explained to investors BNY Mellon's reputation and brand as a trustworthy entity was vital. That presentation slide pledged, among other things, that "[BNY Mellon] will be proactive and treat our clients as partners," that "[BNY Mellon] will put ourselves in the client's shoes," it would act "with the highest standards of integrity and openness to ensure the trust of those we serve," that "[BNY Mellon] will be open and honest", that "[BNY Mellon] will operate with integrity," that "[BNY Mellon] will conduct business with the highest ethical standards," that "[BNY Mellon] will be mindful of our actions," and that "[BNY Mellon] will be responsible members of our communities."

72.     On July 17, 2008, BNY Mellon issued a press release reporting financial results for the second quarter of 2008. For that quarterly period, BNY Mellon reported asset servicing revenues of $868 million, up 25% year-over-year, driven in part by foreign currency exchange trading and "other trading" revenue of $308 million. On BNY Mellon's balance sheet for the quarter, BNY Mellon reported a 75% year-over-year increase in foreign currency exchange trading and "other trading" revenue.

73.     Also on July 17, 2008, BNY Mellon conducted a second quarter 2008 earnings conference call.  During the call, defendants R. Kelly, Gibbons, and Hassell made the following improper statements:

**Robert P. Kelly** – *The Bank of New York Mellon Corporation – CEO*

\* \* \*

We are winning a lot of new business. Net asset flows were plus $13 billion during the quarter…. *New Asset Servicing wins were $600 billion.* Private wealth client assets wins were $2 billion. We saw good momentum in [depository receipts], non-US corporate trust, clearing and treasury services. *We are delivering great service. We won recognition for service quality in Asset Servicing[,[ [c]orporate trust, collateral management and transition management.*

\* \* \*

**Thomas P. Gibbons** - *The Bank of New York Mellon Corporation – CFO*

\* \* \*

Now, my comments going forward will focus on our core business excluding the [sale-in, lease-out] charge. *Our three largest businesses, Asset Management, Asset Servicing and Issuer Services continued to capitalize on the faster growing global markets, as each generated in excess of 40% of their revenues outside of the US.* Non-US revenue for the company increased to 35% from 30% in the second quarter of '07 and 33% in Q-1. We kept expense growth to 2% resulting in 500 basis points of positive operating leverage. If you exclude the securities losses we had year-over-year positive operating leverage of a 1,000 basis points.

\* \* \*

*Traditionally, the third quarter is impacted by seasonality associated with lower levels of capital markets related revenues, particularly securities lending and foreign currency exchange. However, given the ongoing volatility in the markets we may see better than historical trend in some our businesses including foreign exchange.* Of course, if the current weak equity markets hold, it will obviously impact market performance and asset and wealth management. Expense growth is being managed especially carefully. The credit provisions should be stable with Q2, and we are continuing to focus on delivering our synergy targets. We expect the tax rate to be approximately 33%.

\* \* \*

**Gerald L. Hassell** – *The Bank of New York Mellon Corporation - President*

*Ken, a good example on the revenue synergy side would be an area like foreign exchange where the combined book continues to perform very well, and I would suggest we maybe out performing our peers in some of the categories because of the revenue synergy associated with combining the books.* That's a great example where we are pulling through, which is showing up in existing revenue, how those synergies are coming together. Some of the other revenue synergies are around the asset gathering capabilities, some of which are showing up in Pershing's numbers, some showing up in Asset Management numbers. So we are

tracking, we are on or ahead of schedule of what we updated you on in the investor conference and feel very good about the continued opportunities going forward.

\* \* \*

**Thomas P. Gibbons** - *The Bank of New York Mellon Corporation – CFO*

*Almost all of the head count increases that you are seeing are really related to growth in our Asset Servicing businesses.* And I'll let Jim and Tim speak to that in a moment. But we are on track to manage to the numbers that we have given to you. So I think any growth that you are seeing is just the growth in the underlying businesses and I don't know Jim or Tim if you want to add something to that?

74.    On October 16, 2008, BNY Mellon issued a press release reporting BNY Mellon's third quarter 2008 financial results. For that quarter, BNY Mellon reported "*record*" foreign currency exchange trading and "other trading" revenue of $385 million, and highlighted the fact that the number was up 62% year-over-year.

75.    That same day, on BNY Mellon's third quarter 2008 earnings conference call, defendants R. Kelly and Gibbons made the following improper statements:

**Robert P. Kelly** – *The Bank of New York Mellon Corporation – Chairman & CEO*

...*Our operating performance exceeded expectations. It was driven by* the diversity of our six security servicing *and asset management businesses plus* the impact of market volatility.... We now have $82 billion in non-interest bearing deposits, up $50 billion this year. Clearly that would help [net interest income] as well. *Market volatility resulted in record levels of foreign exchange and trading revenue based upon client volumes and activity.* Credit quality remains strong; Non-performing loans actually declined this quarter.

Our earnings were impacted by capital support agreements. However, it is highly unlikely we will create new ones going forward.

\* \* \*

**Thomas P. Gibbons** - *The Bank of New York Mellon Corporation – CFO*

...*Fee revenue was strong in security servicing and even more so in foreign exchange and other trading.* Fee revenue was negatively impacted by the decline in equity values, principally in our asset and wealth management fees. Net interest revenue benefitted from a large inflow of non-interest bearing deposits late in the quarter and I think the ability of our security servicing businesses to attract

deposits reflects a very positive view of [BNY Mellon] during turbulent market periods.

\* \* \*

*[Foreign exchange] and other trading revenue generated extremely strong growth of 62% year-over-year and 25% sequentially.* We benefitted from higher levels of currency volatility and client volumes relative to both periods, as well as the higher value of our portfolio credit default swaps, which we used to hedge certain loan exposures.

\* \* \*

I'm going to conclude my remarks by offering a few observations about the fourth quarter. *Given the ongoing volatility in the markets, we may continue to see better than historical trend performance in foreign currency exchange, net interest revenue and securities lending.* Weak equity markets will continue to impact asset management and performance fees. We will continue to manage expense growth especially carefully.

76.     On January 20, 2009, BNY Mellon issued a press release reporting its financial results for the fourth quarter of 2008. BNY Mellon reported that during that quarter, while numerous large American financial institutions were collapsing, BNY Mellon had made $782 million in asset servicing fee revenue, comprised in large part of "record" foreign and "other trading" revenue of $510 million, up 67% year-over-year.

77.     That same day, BNY Mellon held a fourth quarter 2009 earnings conference call, during which defendants R. Kelly and Gibbons made the following improper statements:

**Robert P. Kelly** – *The Bank of New York Mellon Corporation – Chairman & CEO*

Frankly its pretty good to see 2008 in the rear view mirror now. We generate a profit every quarter including in the fourth quarter. We had record levels of revenue in our institutional servicing businesses in Q4. *We had outstanding results in foreign currency exchange and net interest income.*

*We enjoyed a flight to quality in deposits, wide spreads in net interest income and we enjoyed volatility in the foreign currency exchange markets which really helped those revenues.*

\* \* \*

**Thomas P. Gibbons** - *The Bank of New York Mellon Corporation – CFO*

\* \* \*

*Volatility was also a key driver for us. We gauge volatility based on a basket of the 30 major currencies and during the quarter exchange rates were volatile, and combined with increased market share we enjoyed a record quarter for our foreign currency exchange business.*

78.   On February 27, 2009, BNY Mellon filed a Form 10-K with the SEC reporting its financial results for the fiscal year 2008. In the Form 10-K, defendants R. Kelly, Gibbons, Bruch, Donofrio, Hassell, E. Kelly, Kogan, Kowalski, Luke, Nordenberg, Rein, Richardson, Scott, Surma, and von Schack stated that the Company had revenue of $1.462 billion from foreign currency exchange trading and "other trading," up 86%, or $540 million, compared to the fiscal year 2007. For the year 2008, foreign currency exchange reported asset servicing revenue of $3.3 billion.

79.   On April 21, 2009, the Company issued a press release reporting its first quarter 2009 financial results. For the quarterly period, BNY Mellon reported foreign currency exchange trading and "other trading" revenue of $309 million, and highlighted the fact that this number was up 19% year-over-year, the financial crisis notwithstanding.

80.   Also on April 21, 2009, BNY Mellon held its first quarter 2009 earnings conference call, during which defendants R. Kelly and Gibbons made the following improper statements:

**Robert P. Kelly** – *The Bank of New York Mellon Corporation – Chairman & CEO*

*...In Q1, interbank lending spreads declined, deposit levels had finally started to moderate and volatility has come down in [foreign exchange].*

The good news is that this is, of course, positive for the financial markets overall. We're starting to see some improvements in the money markets, with fixed-income activity in some of the equity markets.

\* \* \*

In wealth management, we had our 13th consecutive quarter of net positive client assets flows. *In asset servicing, we posted strong new business wins. Over the past year we won $1.9 trillion in assets in new assets under custody, and that's over $300 billion in the most recent quarter.*

\* \* \*

**Thomas P. Gibbons** - *The Bank of New York Mellon Corporation – CFO*

*[Foreign exchange] and other trading revenue increased 19% year-over-year,* and it actually declined 40% sequentially. The increase from the year-over-year quarter reflects the benefit from higher volatility of key currencies, partially offset by lower client volumes. The decrease from the record fourth quarter reflects the impact of both lower volatility and client volumes. With approximately 85% of the [foreign exchange] revenue driven by our securities servicing clients, lower volume and values negatively impact the trading revenue. *We are pleased once again, however, to be recognized for our quality service in the Global Investor magazine's, [Foreign Exchange] Survey, who rated the number one [foreign exchange] provider, and we won best [foreign exchange] service overall.*

\* \* \*

On a positive note, *in asset servicing for the second year in a row we ranked number one among all global custodians in the R&M survey, and we now have the number one quality ranking across all three major custody surveys.*

81.     On July 22, 2009, BNY Mellon issued its press release announcing its financial results for the second quarter of 2009 and reporting that foreign trading and "other trading" revenue was down 23% to $239 million.

82.     On October 20, 2009, BNY Mellon issued its financial results for the third quarter 2009, reporting foreign and "other trading" revenue of $246 million, down 36% year-over-year. During its October 20, 2009 third quarter 2009 earnings conference call, defendant Gibbons explained the decrease in foreign currency exchange revenue as follows:

[Foreign exchange] and other trading revenue increased 4% sequentially, reflecting strength and fixed income derivatives trading and a smaller loss and credit default swap hedges, partially offset by lower foreign exchange revenue driven by lower volatility and seasonality.

The year-over-year decrease of 36% reflects lower foreign exchange revenue driven by lower volumes and volatility as well as a lower valuation of the credit derivatives portfolio used to hedge the loan portfolio.

83.     On January 20, 2010, BNY Mellon held its fourth quarter 2009 earnings conference call, during which defendant R. Kelly made the following statements with respect to BNY Mellon's asset management services:

Several of our core businesses are showing some improvement with a particularly strong quarter in asset management. However, the persistently low interest rate environment around the world continued to challenge our net interest revenue. It also impacts fee revenue due to fee waivers that are pretty substantial in our company....

*Fee revenue was actually up 2% versus the prior quarter excluding the net impact of third quarter asset sales. We had excellent growth in assets in wealth management fees.* They were up 13%. We had net long-term asset flows of $14 billion which was the biggest increase since 2006, and performance fees were up $58 million. *Our securities servicing fees excluding SEC lending revenue was actually up 1% led by core fees in asset servicing, as well as in issuer services.*

84.     On April 20, 2010, BNY Mellon conducted its first quarter 2010 earnings conference call, during which defendants R. Kelly and Gibbons made the following statements:

**Robert P. Kelly** – *The Bank of New York Mellon Corporation – Chairman & CEO*

Service levels remain very strong. The last annual R&M survey of custody clients and fund managers BNY Mellon asset servicing was ranked number one overall in six key categories, and ahead of our peer group in a further seven categories.

In Global Investor Magazine's annual [foreign exchange] survey we were ranked number one in 25 categories including four overall performance categories and 14 of the 20 service categories. This is the third consecutive year in which we have essentially dominated this survey.

\* \* \*

**Thomas P. Gibbons** - *The Bank of New York Mellon Corporation – CFO*

\* \* \*

[Foreign exchange] and other trading revenue was up 7% sequentially reflecting higher fixed income trading revenue and lower mark-to-market adjustments on credit default swaps that we used to hedge the loan portfolio. The increase was partially offset by lower [foreign exchange] revenue which was down 14%

compared to the first quarter of 2009 reflecting lower volatility, partially offset by volumes. Investment and other income was driven by above trend gains on continued disposition of the lease assets and a positive [foreign exchange] revaluation for the quarter. We would expect lease gains to be lower going forward.

85.     On July 20, 2010, BNY Mellon conducted its second quarter 2010 earnings conference call, during which defendant Gibbons made the following statement:

Thanks Bob and good morning. As I get into the numbers, my numbers will follow the quarterly earnings review beginning on page three. Let me isolate a few points, key data points on a sequential basis. First of all, we earned $0.55 for the quarter on both a reported and operating basis. *Fee revenue benefited from a 6% increase in security servicing fees, and a 39% increase in foreign exchange.*

\* \* \*

*[Foreign exchange] revenue of $244 million was up 39% sequentially, on higher volatility.* The [foreign exchange] in other trading line was down 16% however, due to negative other trading revenue of $24 million, which is largely a result of the credit value adjustment driven by widening spreads in the quarter, as well as a lower level of fixed income trading.

\* \* \*

Okay, why don't we start with the trading revenue. There are really three drivers of what – let's start with [foreign exchange], [foreign exchange] was strong, volumes were pretty good, obviously volatility was up and we saw the 39% increase.

The decline in other trading revenue was a reflection of three things. First of all, it's just lower fixed income across trading across-the-board. Secondly, the credit valuation adjustment in our derivatives portfolio was a negative for the quarter. We saw spreads widen.

86.     On April 19, 2011, BNY Mellon conducted its first quarter 2011 earnings conference call, during which defendants Gibbons and Palmero made the following statements:

**Alexander Blostein** - *Goldman Sachs Group Analyst*

Okay, that's helpful. And then maybe just one more follow-up on [foreign exchange]. *Is there a way for us to – for you guys to size for us how much of your [foreign exchange] business comes from really standing instructions versus negotiated trades? Just, again, to help us kind of size that bucket that obviously has been a lot in the press.*

\* \* \*

**J. Jeffrey Hopson** - *Stifel, Nicolaus & Co., Inc.*

...Just a question on pricing, *If there's more, I guess, scrutiny of [foreign exchange] rates, etc., it has maybe limited your ability to get full pricing. So in terms of the pricing environment with rates low, how do we know, I guess, that you are getting the appropriate -- how are you getting the appropriate pricing for the new business that is coming in the door?*

\* \* \*

**Rob Rutschow** – *CLSA - Analyst*

Okay. *If I could follow up with a question on [foreign exchange]. Historically, that's been one of your highest margin businesses. With what's going on, should we expect the pre-tax margin on that business to come down towards the level of the rest of the firm?*

**Thomas P. Gibbons** - *The Bank of New York Mellon Corporation – Vice Chairman & CEO*

Rob, *I would say it's probably early to tell. Right now, our behaviors and the revenues are consistent with the drivers that we've seen historically. Given the increased attention, we would expect the competitiveness of [foreign exchange] to – it's been competitive, it will continue to be competitive, and there is some potential there for margin compression. It's unfortunate. I can't deny that, but I think we are in the process of taking a number of actions to increase, for example, the volumes that is done with us to mitigate that.*

*Right now 75% of the transactions - [foreign exchange] transactions that our clients execute are done away from us. So there's a real opportunity for us to capture more of that business that's done away. In terms of the operating margin on [foreign exchange], the actual standing instructions have higher costs associated with them.* So I don't think the margin implication is going to be that high. I don't know, Jim, do you have anything to add to that?

**James P. Palermo** – *The Bank of New York Mellon Corporation – Vice Chairman & CEO of Global Client Management*

Yes, I definitely agree with you, ... *that likely going forward, the heightened awareness will add to the competitive nature that we're seeing.* But there's a lot of opportunity there, and our discussions, as I said, that we had just last week with our clients - they're very supportive of the approach that we've taken and they're even more supportive of some of the technology enhancements that we're about to embark upon. And so our expectation is that we will catch more of that flow.

87.    On July 19, 2011, BNY Mellon conducted its third quarter 2010 earnings conference call, during which defendant Gibbons made the following statement:

*Investment management had another strong quarter.* Higher market values; net new business was partially offset once again by higher money market fee waivers. *[foreign exchange] and other trading was up slightly both year-over-year and sequentially.*

[Foreign exchange] revenue totaled $184 million, a decrease of 25% year-over-year, reflecting lower volatility, partially offset by higher volumes. [Foreign exchange] revenue was up 6% sequentially, reflecting higher volatility.

* * *

Yes, we follow very much the [Financial Accounting Standards Board] guidelines. It's based on estimable and probable. So when we feel something we can estimate what a loss is going to be and it is probable, we will reserve for it.

88.    All of the foregoing statements to investors were improper.   The Individual Defendants repeatedly discussed Asset Servicing revenues and foreign currency exchange trading revenues without disclosing that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the Standing Instruction Services.

## THE TRUTH EMERGES

89.    The truth about the illegal foreign currency exchange trading scheme at the Company came amid a series of lawsuits and articles filed against the Company.  The first public complaint was filed by the Southeastern Pennsylvania Transportation Authority on March 7, 2011.   On July 22, 2011, the International Union of Operating Engineers filed a similar complaint in the United States District Court for the Northern District of California.  Then, on August 11, 2011, Virginia and Florida intervened in whistleblower complaints filed within their states.

90.     On October 4, 2011, the Attorney General of New York filed a complaint, which contained thirteen counts related to BNY Mellon's standing instruction practices including: securities fraud, affirmative misrepresentations, "persistent fraud or illegality," violations of the New York State False Claims Act, unjust enrichment, common law fraud, breach of fiduciary duty, and breach of contract. According to the New York Attorney General, Eric T. Schneiderman, BNY Mellon "consistently overcharged customers for processing foreign exchange transactions." The complaint provides a detailed account of the wrongdoing at BNY Mellon, including a "BNY Mellon RFP Misrepresentation Log" which tracks the misrepresentations made by the Company to about 120 of its customers. The New York Attorney General's complaint seeks recovery of about $2 billion, which are the ostensible ill-gotten profits that BNY Mellon generated over the last decade through its Standing Instruction Service.

91.     Also on October 4, 2011, the United States Attorney for the Southern District of New York filed a complaint in the United States District Court for the Southern District of New York reportedly seeking hundreds of millions of dollars, captioned *United States of America v. The Bank of New York Mellon Corporation*, stating claims in connection with the standing instruction practices under the Financial Institutions Reform, Recovery, and Enforcement Act for civil penalties and an injunction against BNY Mellon's "ongoing fraudulent pricing scheme."

92.     On October 26, 2011, the Massachusetts Complaint was filed against BNY Mellon for violating the Massachusetts Uniform Securities Act, including the most detailed information yet about how high the illegal foreign currency exchange scheme at the Company went. According to that action, BNY Mellon's scheme to deceive its clients by misleading and omitting critical information with respect to its foreign currency exchange Standing Instruction

Service was perpetuated over a minimum of ten years and garnered hundreds of millions in illegal profits for BNY Mellon.

93.     As details publicly emerged about the Company's foreign currency exchange trading scheme, BNY Mellon's market cap plummeted 56% from high of $56 billion to less than $25 billion.

## DAMAGES TO BNY MELLON

94.     As a direct and proximate result of the Individual Defendants' actions, BNY Mellon has expended, and will continue to expend, significant sums of money.    Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement or judgment in multiple class and direct actions brought by the Company's former clients against BNY Mellon;

(b)     costs incurred from defending and paying any settlement or judgment in the ERISA class action;

(c)     costs incurred from responding to any regulatory investigation; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to BNY Mellon.

95.     Moreover, these actions have irreparably damaged BNY Mellon's corporate image and goodwill, which, as a custodial bank is one of the Company's most important assets.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96.     Plaintiff brings this action derivatively in the right and for the benefit of BNY Mellon to redress injuries suffered, and to be suffered, by BNY Mellon as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.    BNY Mellon is named as a nominal

defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff will adequately and fairly represent the interests of BNY Mellon in enforcing and prosecuting its rights.

98.     Plaintiff was a shareholder of BNY Mellon at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current BNY Mellon shareholder.

99.     The current Board of BNY Mellon consists of the following thirteen individuals: defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma Face a Substantial Likelihood of Liability for Their Misconduct**

100.    As alleged above, defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma breached their fiduciary duties of loyalty by making improper statements in the Company's SEC filings that omitted material information about the Company's Asset Servicing revenues and foreign currency exchange trading revenues. Accordingly, a demand upon defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma is futile.

101.    Defendant Hassell is the Company's CEO and has been President of the Company since 2007. In these positions he is directly responsible for the illegal foreign currency exchange scheme occurring at BNY Mellon, through which it overcharged its clients billions of dollars.

102.    Defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma breached their fiduciary duties by failing to monitor the Company. As explained herein, the illegal foreign currency trading scheme lasted over a decade and overcharged the Company's clients billions of dollars. It is absurd to suggest that defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma did not know of a scheme of such magnitude that occurred for so long. The only possible way they could have been unaware of this scheme is if they consciously failed to monitor the Company. In either circumstance, defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma breached their duty of loyalty. Accordingly, demand upon defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma is futile.

103.    Defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma's actions since the disclosure of the illegal foreign currency exchange scheme also demonstrates the futility of making a demand. On October 6, 2011, the Company, on information and belief, with the approval of defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma, published a full page advertisement in the The New York Times and other papers which stated that the lawsuits against the Company "wrongly claim that we haven't been truthful about pricing of foreign exchange (FX) services we provide to our institutional clients. Those claims are flat out wrong and we will fight them in court." In light of this statement, at a minimum, there is a reason to doubt that the Board can fairly and adequately

consider a demand to investigate and initiate litigation. Accordingly, demand on the entire Board is futile.

104.    Defendants Rein, Kogan, Richardson, Kowalski, Surma, and Scott, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

105.    Defendants von Shack, Luke, Nordenberg, Donofrio, Bruch, Kowalski, and E. Kelly, as members of the Risk Committee, were directly responsible for oversight of the Company's fiduciary responsibilities. This includes the Company's relationship with its custodial clients that utilize the Standing Instruction Services. In addition, they were charged with "review[ing] reports on fiduciary activities of the Corporation's businesses." Despite this duty, defendants von Shack, Luke, Nordenberg, Donofrio, Bruch, Kowalski, and E. Kelly blatantly failed to enact adequate internal controls to prevent BNY Mellon for improperly and illegally taking advantage of its custodial clients by overcharging them billions of dollars. Thus, the Risk

Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile

106.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by BNY Mellon's officers and directors and these acts are incapable of ratification.

107.    Each of the defendant directors of BNY Mellon authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

108.    BNY Mellon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for BNY Mellon any part of the damages BNY Mellon suffered and will suffer thereby.

109.    If BNY Mellon's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of BNY Mellon. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by BNY Mellon against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause BNY Mellon to sue themselves or certain

of the officers of BNY Mellon, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause BNY Mellon to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

110.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for BNY Mellon for any of the wrongdoing alleged by plaintiff herein.

111.    Plaintiff has not made any demand on the other shareholders of BNY Mellon to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    BNY Mellon is a publicly held company with over 1.2 billion shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.     The Individual Defendants owed and owe BNY Mellon fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe BNY Mellon the highest obligation of good faith, fair dealing, loyalty, and due care.

114.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within BNY Mellon, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

115.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing about the illegal foreign currency exchange scheme occurring at the Company. Indeed, internal e-mails show that the Officer Defendants were aware of this wrongdoing and encouraged it. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

116.     Director Defendants, as directors of the Company, owed BNY Mellon the highest duty of loyalty. These defendants breached their duty of loyalty by approving or recklessly permitting the improper activity concerning BNY Mellon overcharging its customers by billions of dollars for foreign currency transactions. Accordingly, defendants Hassell, Rein, von Schack, Kogan, Luke, Nordenberg, Richardson, Donofrio, Bruch, Kowalski, Scott, E. Kelly, and Surma breached their duty of loyalty to the Company.

117.     The Individual Defendants also breached their duty of loyalty by knowingly or recklessly making the improper statements detailed herein concerning the Company's assert servicing segment and in foreign currency exchange trading.

118.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BNY Mellon has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

119.     Plaintiff, on behalf of BNY Mellon, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

120.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.     As a result of the illegal foreign currency exchange scheme detailed herein, and due to the Individual Defendants failure to conduct proper supervision, the Individual Defendants have caused BNY Mellon to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

122.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

123.     Plaintiff, on behalf of BNY Mellon, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

124.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BNY Mellon.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to BNY Mellon.

126.    Plaintiff, as a shareholder and representative of BNY Mellon, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

127.    Plaintiff, on behalf of BNY Mellon, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of BNY Mellon, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing BNY Mellon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BNY Mellon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      A proposal to strengthen oversight of the Company's foreign currency exchange transactions;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.      a provision to permit the shareholders of BNY Mellon to nominate at least three candidates for election to the Board; and

4.      a proposal to strengthen BNY Mellon's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law and equity statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of BNY Mellon has an effective remedy;

D.      Awarding to BNY Mellon restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 22, 2011                LAW OFFICES OF THOMAS G. AMON

                                        _____
                                        THOMAS G. AMON  (TGA-1515)

                                        250 West 57th Street, Suite 1316
                                        New York, NY 10107
                                        Telephone: (212) 810-2430
                                        Facsimile: (212) 810-2427
                                        tamon@amonlaw.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
GINA STASSI
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
ssanders@robbinsumeda.com
gstassi@robbinsumeda.com

THE WARNER LAW FIRM
PAUL T. WARNER
11123 McCracken Circle, Suite A
Cypress, TX 77429
Telephone: (281) 664-7777
Facsimile: (281) 664-7774
pwarner@warner-law.net

Attorneys for Plaintiff

670523

## VERIFICATION

I, Christina Carroll, hereby declare as follows:

I am counsel for the Iron Workers Mid-South Pension Fund, plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _11 /21 /11_

_Chris L Carroll_

CHRISTINA CARROLL