**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| IN RE: THE BANK OF NEW YORK MELLON CORP. FOREIGN EXCHANGE TRANSACTIONS LITIGATION | ) ) ) ) |
| | ) |
| This Document Relates to: | ) |
| In re The Bank of New York Mellon Corporation Shareholder Derivative Litigation, Lead Case No. 1:11-CV-08471-LAK-JLC | ) ) ) ) |

12 MD 2335 (LAK)

ECF CASE

### VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

"Pricing is an art, not a science."

~David Nichols, The Bank of New York Mellon Corporation Global Markets Managing Director

### SUMMARY OF THE CASE

1.      This is a derivative action, brought by shareholders of The Bank of New York Mellon Corporation ("BNY Mellon" or the "Company") on behalf of the Company to remedy the harm wrought by certain of BNY Mellon's directors and executive officers.  The defendants' breaches of fiduciary duty have exposed the Company to billions of dollars in damages, including, among other things, costs to the Company associated with multiple lawsuits brought by various states, agencies, and private plaintiffs.  Plaintiffs seek redress for the Company's faithless fiduciaries' willingness to gamble BNY Mellon's most valuable asset, its reputation, in exchange for short term profits and to aggrandize their own positions.  Plaintiffs also seek to hold BNY Mellon's fiduciaries accountable for knowingly breaching their duties to the Company by causing and/or consciously or recklessly allowing it to operate in violation of the law.  Though it involves complicated transactions and contracts, at its heart, this case is simply about

lies the defendants told to BNY Mellon's customers so that defendants could make "bundles of cash," as defendant Robert P. Kelly ("R. Kelly"), then the Company's Chief Executive Officer ("CEO"), characterized it.

2.    The Company, as a custodial bank, provides a variety of services to its clients, including foreign currency exchange ("FX").  Clients can contact BNY Mellon directly and negotiate a price or exchange rate for a specific FX.  BNY Mellon also offers its clients a "standing instruction" ("SI") service pursuant to which BNY Mellon automatically, on an as needed basis, provides currency exchanges for custody related FXs, including securities trade settlement, income conversions (including dividends and bank interest), corporate actions, tax reclaims, interest postings, and residual balances.  Unlike negotiated currency trades, BNY Mellon unilaterally determines the price clients receive for SI trades.  The Company has long described itself as an "open and honest" custodian that operates and conducts business at the "highest standards of integrity."

3.    The principal misrepresentations at issue concern BNY Mellon's executions of FX transactions for its custodial clients.  The Individual Defendants (as defined herein) described the Company's SI exchange service as a "free of charge," "cost-effective" service which operated under "best execution" standards, requiring BNY Mellon to extend every effort to obtain the best price for its clients.  Unbeknownst to the Company's clients, however, BNY Mellon, under the guidance of its senior management and with the tacit approval of its Board of Directors ("the Board"), was actually rigging the price of FX transactions to reap illegal profits at the expense of its custodial clients.

4.    Rather than charging clients the "best rate of the day," or the "best execution" price, BNY Mellon would charge clients the exact opposite: the day's *worst* (or close to the

worst) rate of that day.  For SI trades, BNY Mellon would execute the trade at a certain rate, but the FX rate actually charged to the SI client bore no relationship to the market rate at the time the trade was executed.  Instead, BNY Mellon would wait until after the day's trading ended to look at the high and low exchange rates for that day, and would then assign a rate charged to the SI client at or near the least favorable trading rate for the day.  The Company pocketed the difference between the rate at which the trade was actually made and the worst rate of the day assigned to the client – a difference that could reach over thirty basis points depending on market volatility.  By comparison, the average markup charged for negotiated FX transactions was only four basis points.

5.     This FX scheme was highly lucrative and critical to BNY Mellon's overall financial performance.  Indeed, BNY Mellon's FX services are a core business of the Company, and the Company derives substantial revenues from these services.  According to internal Company documents obtained by the New York Attorney General, SI trades accounted for 69% of BNY Mellon's 2009 profits from FX trades, despite representing only 12% of overall trading volume.  This equates to more than $2.4 billion earned by the Company through its unlawful FX scheme from 2008 to 2011.  BNY Mellon's FX trading business, sustained largely by the SI fraud, was also a crucial pillar of the Company's overall financial performance.  FX revenue represented approximately 11% of BNY Mellon's total annual revenue during 2008 through 2011.  The Individual Defendants knew that the SI fraud was a highly profitable business for the Company, as confirmed by, among other things, an internal Company e-mail which stated, "***As we all know***, Standing Instruction is ***the most profitable form of business***."

6.     BNY Mellon, at the direction and with the approval of the Individual Defendants, hid the SI pricing scheme from the Company's clients and intentionally misled SI clients to

maintain lucrative profits.   Internal Company documents establish that BNY Mellon management knew that the SI trading practice was only able to be so profitable **because of a total lack of transparency** as to how the Company determined the rates at which the SI trades were charged to clients.   Although client account statements generally reported FX conversion rates, they did not provide time-stamped execution prices.   Further, when a customer requested additional transparency into the FX trades, the Company's practice was to push the client into an alternative pricing structure, rather than permit the customer to continue using the SI services and actually provide him or her with the transparency requested.   Indeed, according to e-mails released in related governmental litigation against the Company, the Company's management and other fiduciaries were aware that BNY Mellon would not be able to execute this scheme if its clients knew they were being charged such a high mark-up on FX trades.

7.     Further, internal Company documents establish that the highest levels of BNY Mellon's management were well aware of the fraudulent pricing used in SI trades.   One e-mail disclosed in related litigation reveals that defendant R. Kelly, then the Company's CEO, received a detailed explanation as to how the SI service allowed BNY Mellon's traders to "time the currency execution in the marketplace knowing we don't have to get back to the customer immediately with the deal price."   The e-mail went on to explain that "[b]usiness of this type also allows us to take advantage of increase market volatility and wide intra-day trading ranges."   R. Kelly was well aware of the need to hide these practices from the Company's clients, as the e-mail emphasized that "**[a]ll these pricing advantages disappear when** a client trades via an e-commerce platform and **full transparency is achieved (comparison pricing, execution, and confirmation in real time)**."   A March 29, 2011 whistleblower letter from a BNY Mellon employee also confirms that the Company's "**top management was aware of the fraud the entire**

*time*."  Another letter from a former Company employee revealed that the Company's "deceptive practices reflected a ***well thought-out scheme emanating from the highest reaches of senior management***."

8.     Amazingly, BNY Mellon's Board tacitly approved this illegal FX scheme at the Company and consciously (or at a minimum recklessly) allowed it to continue, completely concealing the scheme from the public for over a decade.  The Risk Committee of the Board was required to review any risk of fraud or other risks posed to the Company's reputation, including risks posed by the Company's illicit SI pricing system.  Similarly, the Audit Committee of the Board was required to oversee the Company's compliance with legal and regulatory requirements.  Thus, both the Risk Committee and the Audit Committee members were required to, and did, review the Company's FX pricing practices, and the directors on those committees knew (or recklessly disregarded) that the fraudulent practices were occurring, yet permitted these practices to continue.  During the past two years, however, a lone whistleblower within the Company worked with governmental agencies to shine light on the illicit practices.  Since the truth about BNY Mellon's FX trading practices came to light, the Company has become the subject of a number of civil suits and investigations by the U.S. Department of Justice ("DOJ") and State Attorney Generals ("AGs"), and the target of investigatory articles by *The Wall Street Journal* ("*WSJ*") and others.

9.     In January 2011, the initial whistleblower lawsuit filed by pension funds was unsealed, and the Virginia AG announced that it would intervene in the action.  Following this news, the *WSJ* published several investigative articles that disclosed additional information regarding BNY Mellon's practices, including information derived from internal Company documents.  Additional internal documents and e-mails were disclosed when the Virginia, New

York, and Florida AGs filed complaints in *qui tam* actions.  The United States AG and Massachusetts securities regulators also sued BNY Mellon in separate actions.  The New York Attorney General's lawsuit alone seeks $2 billion in damages.  The Company is also the subject of a class action brought on behalf of BNY Mellon 401(k) savings plan participants, which alleges that the Company and the plan's fiduciaries breached their duty to the plan's beneficiaries.

10.     Significantly, after each of these lawsuits and articles revealed damaging facts regarding the Company's FX practices, BNY Mellon, at the direction and/or with the acquiescence of the Individual Defendants, denied any wrongdoing.  Rather than announce an internal investigation or even remain neutral as to the charges against the Company, the Individual Defendants immediately began an aggressive campaign to discredit and neutralize the revelations contained in the various lawsuits and news articles.  For example, on May 26, 2011, BNY Mellon submitted an op-ed letter to the *WSJ* claiming that the articles regarding the FX scheme were "highly distorted" and contained "inaccurate claims from baseless lawsuits." Likewise, on October 6, 2011, the Company published a full page article in *The New York Times* and other papers stating that the lawsuits against the Company "wrongly claim that we haven't been truthful about pricing of foreign exchange (FX) services we provide to our institutional clients.  Those claims are flat out wrong and we will fight them in court."

11.     Since that time, however, the Individuals Defendants have admitted to much of the wrongdoing they previously denied, leaving no question as to whether the FX scheme actually occurred.  There no longer remains any question as to the wrongdoing at BNY Mellon. In connection with the partial settlement of the U.S. Attorney Action (as defined herein), the Company has admitted that it "assigns pricing to [SI transactions] that are at or near the high end of the range of prices reported in the interbank market for currency purchases … and at or near

the low end of range of prices reported in the interbank market for currency sales," and that "*the pricing of [SI] transactions is generally less favorable to clients than directly negotiated trades*."  The Individual Defendants have also agreed to stop representing that the Company's SI FX trades are executed on a "best execution" standard, among other things.

12.     As a result of the Individual Defendants' knowing participation in and/or tacit approval of the Company's scheme to seek illicit profits through its  decade-long SI FX practices, BNY Mellon currently faces, at a minimum, over *$3 billion* in liabilities from the various pending FX-related actions.  Additionally, the Company is incurring ongoing and mounting legal expenditures, as well as immediate and ongoing reputational harm that has affected, and will continue to materially and severely affect, the Company's value (and stock price).  Further, and perhaps most damaging of all, BNY Mellon's profiteering at the expense of its clients has caused and is continuing to cause clients to leave BNY Mellon now that the fraud has been uncovered. BNY Mellon's clients' lack of trust, and the resulting migration of clients, has severely reduced BNY Mellon's overall FX revenue.  As a result of, inter alia, this reduction in revenue, BNY Mellon's credit rating was downgraded by Moody's Investors Service in March 2012.  Plaintiffs now seek to hold the Company's disloyal fiduciaries accountable for the harm they have caused and continue to cause to BNY Mellon.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a

collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.   This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15.   Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to BNY Mellon occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

16.   Plaintiff Marilyn Clark was a shareholder of BNY Mellon at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current BNY Mellon shareholder.  Plaintiff Clark is a citizen of California.

17.   Plaintiff Iron Workers Mid-South Pension Fund was a shareholder of BNY Mellon at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current BNY Mellon shareholder.  Plaintiff Iron Workers is a citizen of Oklahoma, Louisiana, Mississippi, and Texas.

**Nominal Defendant**

18.     Nominal defendant BNY Mellon is a Delaware corporation with its principal executive offices located at One Wall Street, New York, New York.  BNY Mellon is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.  BNY Mellon is a financial services company that provides various products and services worldwide.

**Defendants**

19.     Defendant Gerald L. Hassell ("Hassell") is BNY Mellon's CEO and Chairman of the Board and has been since August 2011.  Hassell is also BNY Mellon's President and a director and has been since 2007.  Hassell was President and a director of The Bank of New York Company, Inc. ("Bank of New York Co."), a predecessor of BNY Mellon, and President of The Bank of New York, Bank of New York Co.'s principal banking subsidiary, from 1998 to 2007.  Hassell is also Chairman, President, and CEO of BNY Mellon, National Association ("BNY Mellon, N.A."), a principal banking subsidiary of BNY Mellon.  Hassell also served in various other executive positions at Bank of New York Co. and The Bank of New York from 1990 to 2007, including a Senior Executive Vice President, Chief Commercial Banking Officer, and an Executive Vice President.  Hassell directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company was engaging in, the illegal FX scheme.  Hassell knowingly breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Hassell also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper

practice of overcharging investors using the SI service.  BNY Mellon paid Hassell the following

compensation as an executive:

| Year | Salary | Bonus | Value of Performance Shares Earned | Other Annual Compensation | Stock Awards | Option Awards | Securities Underlying Options | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | $866,667 | - | - | - | $2,490,064 | $2,514,414 | - | $4,000,000 | $2,218,704 | $260,411 | $12,350,260 |
| 2010 | $800,000 | - | - | - | $2,709,251 | $2,679,949 | - | $3,272,500 | $1,506,276 | $211,126 | $11,179,102 |
| 2009 | $800,000 | $1,531,250 | - | - | $1,663,282 | $1,423,842 | - | - | $754,783 | $221,107 | $6,394,264 |
| 2008 | $818,462 | - | - | - | $1,521,608 | $3,736,786 | - | - | $1,138,632 | $218,197 | $7,433,685 |
| 2007 | $800,000 | $1,839,000 | - | - | $5,099,001 | $7,869,408 | - | $3,411,000 | $773,913 | $234,545 | $20,026,867 |
| 2006 | $800,000 | $1,075,000 | - | - | $2,754,400 | $766,600 | - | $3,279,000 | $881,000 | $236,700 | $9,792,700 |
| 2005 | $800,000 | $2,100,000 | $3,179,904 | $160,495 | - | - | - | - | - | $44,480 | $6,284,879 |
| 2004 | $800,000 | $2,000,000 | $3,890,088 | $154,770 | - | - | 175,000 | - | - | $44,256 | $6,889,114 |
| 2003 | $696,153 | $2,411,000 | $5,087,232 | $160,848 | $1,599,000 | - | 375,000 | - | - | $37,550 | $9,991,783 |
| 2002 | $650,000 | - | $356,405 | - | $460,224 | - | 375,000 | - | - | $35,013 | $1,501,642 |
| 2001 | $650,000 | $560,000 | $3,266,570 | - | - | - | 250,000 | - | - | $89,293 | $4,565,863 |
| 2000 | $546,154 | $1,400,000 | $5,311,797 | - | - | - | 250,000 | - | - | $93,926 | $7,351,877 |

Hassell is a citizen of New York.

20.     Defendant Thomas P. Gibbons ("Gibbons") is BNY Mellon's Chief Financial

Officer ("CFO") and has been since July 2008 and a Vice Chairman and has been since

September 2010.  Gibbons is also a Vice Chairman and CFO of BNY Mellon, N.A.  Gibbons

was BNY Mellon's Chief Risk Officer from July 2007 to July 2008.  Gibbons was also Bank of

New York Co.'s CFO from September 2006 to June 2007; a Senior Executive Vice President

from April 2005 to June 2007; Chief Risk Officer from at least 2005 to 2006; and an Executive

Vice President from at least 2002 to 2005.  By virtue of his positions, Gibbons directed the

Company to engage in, or at a minimum, knew or recklessly disregarded that the Company was

engaging in, the illegal FX scheme.  Gibbons also breached his duty of loyalty by causing the

Company to violate the law and/or consciously failing to act in the face of a known duty to do so

(i.e., to stop the illegal practices at the Company).  Gibbons knowingly or recklessly made and/or

consciously or recklessly permitted improper statements in the Company's public filings

concerning the Company's Asset Servicing revenues and FX trading revenues that failed to

disclose that a significant factor in those revenues was fee income derived from BNY Mellon's

improper practice of overcharging investors using the SI service.  BNY Mellon paid Gibbons the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|-----------------------------------------------------------------------|------------------------|-------|
| 2011 | $650,000 | - | $1,604,181 | $1,619,856 | $1,780,000 | $1,006,638 | $154,313 | $6,814,988 |
| 2010 | $650,000 | - | $1,641,184 | $1,623,424 | $2,050,000 | $636,918 | $170,714 | $6,772,240 |
| 2009 | $650,000 | $1,200,000 | $920,101 | $787,657 | - | $334,965 | $165,418 | $4,058,141 |
| 2008 | $651,923 | - | $736,537 | $2,149,927 | - | $338,629 | $173,604 | $4,050,620 |
| 2006 | $625,000 | $1,166,000 | $1,889,100 | $823,400 | $799,000 | $8,500 | $113,500 | $5,424,500 |

Gibbons is a citizen of New Jersey.

21.     Defendant Arthur Certosimo ("Certosimo") is BNY Mellon's CEO, Global Markets and has been since May 2011, and a Senior Executive Vice President and has been since March 2009.  Certosimo is also CEO of Global Markets and a Senior Executive Vice President of BNY Mellon, N.A.  Certosimo was BNY Mellon's CEO of Alternative, Broker Dealer, and Treasury Services from at least June 2009 to May 2011, and an Executive Vice President from July 2007 to May 2009.  Certosimo was also Bank of New York Co.'s head of Broker Dealer Services and Alternative Investment Services and an Executive Vice President from at least 2003 to 2007.  Certosimo directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company was engaging in the illegal FX scheme.  Certosimo also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Certosimo is a citizen of New Jersey.

22.     Defendant James P. Palermo ("Palermo") is BNY Mellon's CEO of Global Client Management and Liquidity Services and has been since September 2010, and a Vice Chairman and has been since at least February 2008.  Palermo is also CEO of Global Client Management and Liquidity Services and a Vice Chairman of BNY Mellon, N.A.  Palermo was head of BNY Mellon's Global Markets Business from 2010 to 2011, and head of the Asset Servicing Business

from 2007 to 2010. Palermo was also head of Asset Servicing at Mellon Financial Corporation ("Mellon"), a predecessor of BNY Mellon, from 1998 to 2007, and Vice Chairman of Mellon and Mellon Bank, N.A, Mellon's banking subsidiary, from 2002 to 2007. By virtue of his positions at the Company, Palermo directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company was engaging in the illegal FX scheme. Palermo also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company). Palermo also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service. Palermo is a citizen of Massachusetts.

23. Defendant Wesley W. von Schack ("von Schack") is BNY Mellon's Lead Director and has been since January 2009 and a director since July 2007. von Schack was also a Mellon director from 1989 to 2007. von Schack was BNY Mellon's Lead Director from January 2009 to at least March 2011. von Schack is also a member of BNY Mellon's Risk Committee and has been since July 2007. von Schack knew or recklessly disregarded that the Company was engaging in, the illegal FX scheme and expressly or tacitly approved of it. von Schack also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company). von Schack also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in

those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid von Schack the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|------|------|------|------|------|------|
| 2011 | $143,200 | $109,993 | - | $43,793 | $3,160 | $300,146 |
| 2010 | $138,274 | $109,969 | - | $35,994 | $2,800 | $287,037 |
| 2009 | $134,305 | $109,978 | - | $32,072 | $2,471 | $278,826 |
| 2008 | $125,000 | $102,087 | - | $14,593 | $2,174 | $243,854 |
| 2007 | $57,550 | $42,956 | - | $8,664 | $954 | $110,124 |
| 2006 | $135,500 | $59,782 | $5,878 | $139,698 | $1,654 | $342,512 |

von Schack is a citizen of Maine.

24.     Defendant Catherine A. Rein ("Rein") is a BNY Mellon director and has been since July 2007.  Rein was also a Bank of New York Co. director from 1981 to 2007.  Rein was BNY Mellon's Lead Director from at least March 2008 to December 2008.  Rein is also Chairman of BNY Mellon's Audit Committee and has been since July 2007.  Rein knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Rein also breached her duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Rein also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Rein the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|------|------|------|------|------|
| 2011 | $120,600 | $109,993 | $36,156 | $1,314 | $268,063 |
| 2010 | $122,400 | $109,969 | $25,872 | $970 | $259,211 |
| 2009 | $126,000 | $109,978 | $18,240 | $1,351 | $255,569 |
| 2008 | $128,500 | $76,527 | $17,433 | - | $222,460 |
| 2007 | $58,950 | - | - | $2,404 | $61,354 |
| 2006 | $135,200 | $99,993 | - | - | $235,193 |

Rein is a citizen of New York.

25.     Defendant Richard J. Kogan ("Kogan") is a BNY Mellon director and has been since July 2007.  Kogan was also a Bank of New York Co. director from 1996 to 2007.  Kogan is a member of BNY Mellon's Audit Committee and has been since at least March 2010.  Kogan knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Kogan also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Kogan also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Kogan the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2011 | $129,000 | $109,993 | $238,993 |
| 2010 | $127,200 | $109,969 | $237,169 |
| 2009 | $120,000 | $109,978 | $229,978 |
| 2008 | $98,100 | $76,527 | $174,627 |
| 2007 | $44,100 | - | $44,100 |
| 2006 | $111,400 | $99,993 | $211,393 |

Kogan is a citizen of New Jersey.

26.     Defendant William C. Richardson ("Richardson") is a BNY Mellon director and has been since July 2007.  Richardson was also a Bank of New York Co. director from 1998 to 2007.  Richardson is a member of BNY Mellon's Audit Committee and has been since July 2007. Richardson knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Richardson also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Richardson knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Richardson the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2011 | $124,322 | $109,993 | $610 | $234,925 |
| 2010 | $117,725 | $109,969 | $451 | $228,145 |
| 2009 | $139,024 | $109,978 | - | $249,002 |
| 2008 | $112,500 | $76,527 | - | $189,027 |
| 2007 | $58,500 | - | $567 | $59,067 |
| 2006 | $123,800 | $99,993 | - | $223,793 |

Richardson is a citizen of Michigan.

27.     Defendant Samuel C. Scott III ("Scott") is a BNY Mellon director and has been since July 2007.  Scott was also a Bank of New York Co. director from 2003 to 2007.  Scott is a member of BNY Mellon's Audit Committee and has been since July 2007.  Scott knew or was recklessly unaware that the Company engaged in the illegal FX scheme and explicitly or tacitly approved of it.  Scott also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal

practices at the Company).  Scott knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Scott the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2011 | $141,592 | $109,993 | $334 | $251,919 |
| 2010 | $125,400 | $109,969 | $247 | $235,616 |
| 2009 | $116,400 | $109,978 | $343 | $226,721 |
| 2008 | $128,700 | $76,527 | - | $205,227 |
| 2007 | $45,900 | - | $310 | $46,210 |
| 2006 | $108,000 | $99,993 | - | $207,993 |

Scott is a citizen of Illinois.

28.    Defendant Michael J. Kowalski ("Kowalski") is a BNY Mellon director and has been since July 2007.  Kowalski was also a Bank of New York Co. director from 2003 to 2007. Kowalski is a member of BNY Mellon's Audit Committee and has been since at least November 2011.  Kowalski was also a member of BNY Mellon's Risk Committee from July 2007 to at least March 2011.  Kowalski knew or recklessly disregarded that the Company engaged in the illegal FX scheme and expressly or tacitly approved of it.  Kowalski also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).   Kowalski also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service. BNY Mellon paid Kowalski the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2011 | $112,800 | $109,993 | $334 | $223,127 |
| 2010 | $96,600 | $109,969 | $247 | $206,816 |
| 2009 | $107,400 | $109,978 | $343 | $217,721 |
| 2008 | $92,700 | $76,527 | - | $169,227 |
| 2007 | $31,050 | - | $310 | $31,360 |
| 2006 | $102,000 | $99,993 | - | $201,993 |

Kowalski is a citizen of New Jersey.

29.     Defendant John A. Luke, Jr. ("Luke") is a BNY Mellon director and has been since July 2007.  Luke was also a Bank of New York Co. director from 1996 to 2007.  Luke is a member of BNY Mellon's Risk Committee and has been since July 2007.   Luke knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Luke also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Luke also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Luke the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2011 | $109,100 | $109,993 | $219,093 |
| 2010 | $109,100 | $109,969 | $219,069 |
| 2009 | $114,500 | $109,978 | $224,478 |
| 2008 | $103,400 | $76,527 | $179,927 |
| 2007 | $47,850 | - | $47,850 |
| 2006 | $109,400 | $99,993 | $209,393 |

Luke is a citizen of Virginia.

30.     Defendant Mark A. Nordenberg ("Nordenberg") is a BNY Mellon director and has been since July 2007.  Nordenberg was also a Mellon director from 1998 to 2007. Nordenberg is a member of BNY Mellon's Risk Committee and has been since July 2007. Nordenberg knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Nordenberg also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Nordenberg also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Nordenberg the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|-------------------|--------------|---------------|-----------------------------------------------------------------------|------------------------|-------|
| 2011 | $102,000 | $109,993 | - | $3,553 | $1,907 | $217,453 |
| 2010 | $96,600 | $109,969 | - | $2,920 | $1,670 | $211,159 |
| 2009 | $111,000 | $109,978 | - | $5,381 | $1,461 | $227,820 |
| 2008 | $96,300 | $102,087 | - | $2,448 | $1,278 | $202,113 |
| 2007 | $36,900 | $42,956 | - | $1,431 | $560 | $81,847 |
| 2006 | $111,625 | $59,782 | $5,878 | $18,724 | $5,974 | $201,983 |

Nordenberg is a citizen of Pennsylvania.

31.     Defendant Nicholas M. Donofrio ("Donofrio") is a BNY Mellon director and has been since July 2007.  Donofrio was also a Bank of New York Co. director from 1999 to 2007. Donofrio is Chairman of BNY Mellon's Risk Committee and has been since July 2007. Donofrio knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Donofrio also breached his duty of loyalty by

causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Donofrio also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Donofrio the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|------|-------------------|--------------|------------------------|-------|
| 2011 | $103,700 | $109,993 | $610 | $214,303 |
| 2010 | $100,100 | $109,969 | $451 | $210,520 |
| 2009 | $103,700 | $109,978 | $627 | $214,305 |
| 2008 | $114,200 | $76,527 | - | $190,727 |
| 2007 | $48,650 | - | $567 | $49,217 |
| 2006 | $98,000 | $99,993 | - | $197,993 |

Donofrio is a citizen of Connecticut.

32.     Defendant Ruth E. Bruch ("Bruch") is a BNY Mellon director and has been since July 2007.  Bruch was also a Mellon director from 2003 to 2007.  Bruch is a member of BNY Mellon's Risk Committee and has been since at least May 2009.  Bruch knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Bruch also breached her duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Bruch also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper

practice of overcharging investors using the SI service.  BNY Mellon paid Bruch the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|------------------|--------------|---------------|-------|
| 2011 | $134,300 | $109,993 | - | $244,293 |
| 2010 | $128,900 | $109,969 | - | $238,869 |
| 2009 | $127,100 | $109,978 | - | $237,078 |
| 2008 | $118,350 | $102,087 | - | $220,437 |
| 2007 | $52,700 | $42,956 | - | $95,656 |
| 2006 | $96,000 | $59,782 | $5,878 | $161,660 |

Bruch is a citizen of Illinois.

33.     Defendant Edmund F. Kelly ("E. Kelly") is a BNY Mellon director and has been since July 2007.  E. Kelly was also a Mellon director from 2004 to 2007.  E. Kelly is a member of BNY Mellon's Risk Committee and has been since July 2007.  E. Kelly knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  E. Kelly also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  E. Kelly also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid E. Kelly the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|------------------|--------------|---------------|-------|
| 2011 | $107,400 | $109,993 | - | $217,393 |
| 2010 | $107,400 | $109,969 | - | $217,369 |
| 2009 | $105,600 | $109,978 | - | $215,578 |
| 2008 | $103,500 | $102,087 | - | $205,587 |
| 2007 | $45,900 | $42,956 | - | $88,856 |
| 2006 | $97,500 | $59,782 | $5,878 | $163,160 |

E. Kelly is a citizen of Massachusetts.

34.    Defendant John P. Surma ("Surma") was a BNY Mellon director from July 2007 to April 2012 and a Mellon director from 2004 to 2007.  Surma was a member of BNY Mellon's Audit Committee from July 2007 to April 2012.  Surma knew or recklessly disregarded that the Company was engaging in the illegal FX scheme and expressly or tacitly approved of it.  Surma also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Surma also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid Surma the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|------|------|------|------|------|------|
| 2011 | $100,200 | $109,993 | - | $5,515 | $867 | $216,575 |
| 2010 | $109,200 | $109,969 | - | $4,533 | $769 | $224,471 |
| 2009 | $105,600 | $109,978 | - | $4,039 | $688 | $220,305 |
| 2008 | $108,900 | $102,087 | - | $1,838 | $619 | $213,444 |
| 2007 | $49,500 | $42,956 | - | $1,062 | $281 | $93,799 |
| 2006 | $133,750 | $59,782 | $5,878 | $12,447 | $5,000 | $216,857 |

Surma is a citizen of Pennsylvania.

35.    Defendant R. Kelly was BNY Mellon's CEO from 2007 to August 2011; Chairman of the Board from July 2008 to August 2011; and a director from July 2007 to August 2011.  R. Kelly also served as Chairman and CEO of BNY Mellon, N.A.  R. Kelly was a Mellon director from 2006 to 2007.  By virtue of his positions, R. Kelly directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company was engaging in, the

illegal FX scheme.  R. Kelly also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).   R. Kelly also knowingly or recklessly made and/or consciously or recklessly permitted improper statements in the Company's public filings concerning the Company's Asset Servicing revenues and FX trading revenues that failed to disclose that a significant factor in those revenues was fee income derived from BNY Mellon's improper practice of overcharging investors using the SI service.  BNY Mellon paid R. Kelly the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2011 | $666,667 | - | $4,549,178 | $4,593,643 | $3,610,000 | $3,719,172 | $502,618 | $17,641,278 |
| 2010 | $1,000,000 | - | $7,516,705 | $4,896,057 | $5,610,000 | - | $356,495 | $19,379,257 |
| 2009 | $1,000,000 | - | $4,929,467 | $5,004,484 | - | $2,815,326 | $297,158 | $14,046,435 |
| 2008 | $993,750 | - | $3,075,634 | $7,553,082 | - | $2,221,054 | $340,113 | $14,183,633 |
| 2007 | $975,000 | $7,500,000 | $4,214,650 | $6,164,933 | - | $4,286,296 | $1,661,227 | $24,802,106 |
| 2006 | $864,205 | $5,000,000 | $2,898,462 | $649,973 | - | $6,135,191 | $937,977 | $16,485,808 |

R. Kelly is a citizen of New York.

36.     Defendant Richard Mahoney ("Mahoney") was BNY Mellon's CEO, Global Markets and an Executive Vice President from 2007 to June 2011.  Mahoney was also CEO, Global Markets and an Executive Vice President of Bank of New York Co. from at least 2000 to 2007.  Mahoney directed the Company to engage in, or at a minimum, knew or recklessly disregarded that the Company was engaging in the illegal FX scheme.  Mahoney also breached his duty of loyalty by causing the Company to violate the law and/or consciously failing to act in the face of a known duty to do so (i.e., to stop the illegal practices at the Company).  Mahoney is a citizen of New York.

37.     The defendants identified in ¶¶19-22, 35-36 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶19, 23-35 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶24-28, 34 are referred to herein as the "Audit

Committee Defendants."  The defendants identified in ¶¶23, 28-33 are referred to herein as the "Risk Committee Defendants."  The defendants identified in ¶¶19-36 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

38.      By reason of their positions as officers, directors, and/or fiduciaries of BNY Mellon and because of their ability to control the business and corporate affairs of BNY Mellon, the Individual Defendants owed and owe BNY Mellon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.  The Individual Defendants were and are required to use their utmost ability to control and manage BNY Mellon in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of BNY Mellon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

39.      Each officer and director of the Company owes to BNY Mellon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

**Additional Duties of the Risk Committee Defendants**

40.      In addition to these general fiduciary duties, under the Risk Committee's Charter, Risk Committee Defendants, Bruch, Donofrio, E. Kelly, Kowalski, Luke, Nordenberg, and von Schack, owed and owe specific duties to BNY Mellon to oversee the Company's fiduciary business, including overseeing the fiduciary activities of the Corporation's businesses.

41.      Specifically, the Risk Committee Defendants were charged with "review[ing] significant financial and other risk exposures and the steps management has taken to monitor,

control and report such exposures" including reputational, operational, and fraud risk, among other things.  The Risk Committee Defendants therefore had the duty to review and evaluate the risks the illicit FX pricing scheme posed to the Company.  The Risk Committee Defendants also had the duty to "review reports on fiduciary activities of the Corporation's businesses" and provide oversight of BNY Mellon's "*investment of fiduciary assets*."  The Risk Committee Defendants therefore had the duty to oversee and review the Company's FX pricing system to ensure that the Company was meeting its fiduciary obligations in connection with the Company's relationships with its custodial clients that utilized the SI services.

**Additional Duties of the Audit Committee Defendants**

42.     In addition to these general fiduciary duties, under the Audit Committee's Charter, the Audit Committee Defendants, Kogan, Kowalski, Rein, Richardson, Scott, and Surma, owed specific duties to BNY Mellon to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements.  In addition, the Audit Committee members were charged with overseeing the Company's compliance with legal and regulatory requirements.

43.     Specifically, the Audit Committee Charter charges defendants Kogan, Kowalski, Rein, Richardson, Scott, and Surma with "*review[ing] with management*, the General Counsel, the Chief Compliance Officer, and the Chief Auditor *[BNY Mellon's] compliance with laws and regulations*."  In fulfilling this duty, the Audit Committee Defendants *received semi-annual reports from the Company's Chief Compliance Officer and Risk Committee of the Board regarding the Company's compliance with laws and regulations*.

**Control, Access, and Authority**

44.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of BNY Mellon, were able to and did, directly and/or indirectly,

exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

45.     Because of their advisory, executive, managerial, and directorial positions with BNY Mellon, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of BNY Mellon.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding the fees BNY Mellon charges for its FX services and the prudence of investing in the Company.

46.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BNY Mellon, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

47.     To discharge their duties, the officers and directors of BNY Mellon were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of BNY Mellon were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)      remain informed as to how BNY Mellon conducted its operations, and, upon receipt of notice or information of illegal, imprudent, or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

48.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of BNY Mellon, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or were reckless in not being aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of BNY Mellon's Board.

49.      The Individual Defendants breached their duty of loyalty and good faith by consciously or recklessly allowing defendants to cause, or by themselves causing, the Company to engage in the illegal FX scheme detailed herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of

numerous lawsuits.   BNY Mellon has, therefore, expended and will continue to expend significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

53.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully mislead its clients about how it charged them for FXs.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

56.    In July 2007, Mellon Financial Corporation and The Bank of New York Company, Inc. merged to create BNY Mellon.  BNY Mellon is the world's largest global custodian bank.  A custodian bank is a financial institution that holds and safeguards financial assets of firms and individuals, such as stocks, bonds, and currency.

57.    Many of BNY Mellon's customers invest in foreign securities that are required to be purchased and sold in the currencies of the countries in which the securities are issued. Therefore, in order to execute these investments, BNY Mellon's clients must first change their U.S. currency into the foreign currency when purchasing the security (and vice versa when selling the security).  In addition, these foreign securities can earn income in the foreign currency (such as a dividend), which BNY Mellon's clients will often choose to repatriate.

58.    BNY Mellon generally offered its customers two types of FX services: (i) negotiated FX; and (ii) "indirect," or "SI," FX.  As the name implies, a negotiated FX involves a client or its investment manager negotiating directly with BNY Mellon's FX traders to purchase or sell currency.  Conversely, SI currency exchanges are conducted on a non-negotiated basis, and the client does not receive a quoted exchange rate based on the current market prices. Instead, an SI trade is automatically conducted on an as needed basis pursuant to a standing authorization, with BNY Mellon unilaterally determining the exchange rate.

59.     As a custodian bank, BNY Mellon had a fiduciary relationship with its SI clients and continually represented to clients that it understood the fiduciary obligations of the investment managers working on behalf of the Company's custodial clients.  As detailed below, BNY Mellon represented that it met these fiduciary obligations by utilizing "best execution" standards to obtain the best rates for SI clients.  By way of example, as revealed in the Virginia AG's *qui tam* complaint, BNY Mellon represented to the Fairfax County Retirement System that "all services and systems described [in the Custody Agreements] are available, deliverable and performed by professionals ***abiding to the highest fiduciary standards***." Likewise, the Custodian Agreement between the Virginia Retirement System and BNY Mellon's predecessor also states that the Company "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims and responsibilities."  Additionally, BNY Mellon stated that its working definition of "best execution" included the Company assisting investment managers in discharging their fiduciary obligations to their clients: "***Understanding the fiduciary role of the fund manager***, it is our goal to provide best execution for all foreign exchange executed in support of our clients' transactions."

## THE ILLEGAL FX TRADING SCHEME

**BNY Mellon, at the Direction and/or with the Approval of the Individual Defendants, Enticed Clients to Create Custodial Accounts by Making Misleading Statements Regarding How It Priced FX Trading**

60.     BNY Mellon's employees misled prospective customers, including its custodial clients and clients' investment managers, about the Company's SI service.  As detailed below, BNY Mellon also misled its clients and omitted pertinent information when seeking to retain its existing custodial relationships.

61.     "Best execution" is an industry term commonly understood to mean that a client receives the best available market price at the time that the currency trade is executed.

62.     BNY Mellon told its prospective clients that SI FX transactions were executed according to "best execution" standards at the "best rate of the day," and that the Company provided SI clients with FX services "free of charge." The Company made these statements on its website in response to a request for proposal ("RFP") from clients regarding the Company's FX services and specific inquiries from SI clients about BNY Mellon's SI pricing.  For example, on its website, BNY Mellon represented that its SI service was "[o]perationally simple, free of charge and integrated with the client's activity on the various securities markets," and that SI clients received the benefit of FX trades "execut[ed] according to best execution standards." These statements, however, were not true.

63.     The Company's own documents demonstrate that BNY Mellon's fiduciaries understood the industry definition of "best execution."  For example, an internal e-mail at the Company stated that the industry definition of best execution was execution "to achieve the goal of maximizing the value of the client portfolio under [the] particular circumstances of the time." BNY Mellon's definition of best execution also invoked the U.S. Securities and Exchange Commission's ("SEC") statement that "best execution is trading 'in such a manner that the client's total costs or proceeds in each transaction is the most favorable under the circumstances.'"

64.     "The Complaint filed in the *State of New York, ex rel. FX Analytics v. The Bank of New York Mellon Corporation* complaint (the "New York Complaint") echoes plaintiffs' allegations herein that BNY Mellon employees were aware of the meaning of "best execution" and made representations to clients falsely promising to provide best execution.

65.     The amended complaint in *United States of America v. The Bank of New York Mellon*, ("U.S. Attorney Action") further underscores the fact, as it details an August 2005 Question and Answer document given to clients inquiring about best execution standards that states that BNY Mellon "ensures best execution" by offering the "best rates for our clients."  This Question and Answer document also referenced the price provided in an FX trade as the "best rate of the day."

66.     The Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts filed an administrative action against BNY Mellon that detailed some of the Company's many misrepresentations, including misrepresentations made to the Massachusetts Pension Reserves Investment Management Board ("PRIM") (the "Massachusetts Complaint").

67.     As revealed in the Massachusetts Complaint, BNY Mellon's interactions with PRIM go back to 2002, when the Company responded to PRIM's RFP.  At that time, BNY Mellon explained its FX capabilities as follows:

> *Foreign currency exchange Trading Desk.* Mellon operates full service trading rooms in London, Boston, and Pittsburgh providing 24-hour market access for our clients.   We have an extensive Foreign Exchange Division. We provide investment managers of our clients with access to one of the most competitive and efficient foreign exchange operations in the industry.
>
> *   *   *
>
> In addition to these services, Mellon [Global Securities Services] can accommodate standing instructions to convert and transfer specified currencies upon receipt. With such instructions in place, clients can avoid spending time and effort monitoring currency balances and issuing specific routine instructions.

68.     In addition, BNY Mellon provided the following description of its SI service to PRIM in both its January 2008 and November 2008 proposals responding to PRIM's RFPs for Master Custody Services:

[A] simple, flexible, and complete service solution that automates the capture of all types of custody-related foreign currency exchange, including securities trade settlement, income conversions, corporate actions, tax reclaims, interest postings and residual balances. Operationally simple, *free of charge* and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients minimize risks and costs related to the foreign currency exchange and concentrate on their core businesses.

69.     Even after a custodial client relationship commenced as a result of the RFP process, BNY Mellon continued to omit material information from its marketing and client materials, including, for example, its Global Account Opening Documentation Package (which was attached as an exhibit to the Massachusetts Complaint).  BNY Mellon claimed that it would price SI FX transactions "at a rate not less favorable than indicated on the *Daily Schedule* for that day."

70.     Additionally, BNY Mellon claimed that the SI service included "netting:" "Currency purchases and sales effected pursuant to FX Procedures in the same currency and having the same trade and value date may be netted for pricing purposes within a customer account." Netting involves aggregating a client's multiple FX transactions so that both the buying and selling of a particular currency is conducted in a singular trade; thus, a client incurs the cost of only one trade representing the net amount of the currency needed for all transactions. Netting can result in significant cost savings by saving the client by avoiding the transaction costs of doing separate trades representing the combined value of the multiple trades.

71.     As discussed below, these representations were false and misleading and were intended to, and did, convince customers to use the SI service to their detriment (but to the benefit of the Company's bottom line).

**BNY Mellon Used Its Standing Instruction Service to Maximize Profits for the Bank**

72.     BNY Mellon told its clients that the SI service was "free of charge" and that SI trades would be conducted under "best execution" standards.   In reality, as BNY Mellon

employees have admitted and as internal Company documents have confirmed, BNY Mellon did almost the exact opposite – it charged exorbitant mark-ups on SI transactions by belatedly cherry-picking exchange rates that maximized BNY Mellon's profits to the detriment of its clients.

73.     The illegal FX scheme was deceptively simple.   When an SI client bought a foreign currency, BNY Mellon would buy the currency at one rate, charge the client a higher rate, and then keep the rate difference for itself.   This pricing scheme involved two main procedures.

74.     <u>First</u>, rather than execute an FX transaction at, or concurrent with, the actual time when an SI client requested an FX transaction, BNY Mellon's transaction desk allowed all requests for currency exchanges to accumulate throughout the day.   Then, at an arbitrary time, the transaction desk executed one FX trade for each particular currency.   The exchange rate that the trader received or paid at that time was BNY Mellon's true cost of the FX transaction.

75.     <u>Second</u>, BNY Mellon observed the high and low exchange rates of the day for the currencies involved in the FX trades, and waited until the end of the FX trading day to assign an exchange rate to the SI client's trade.   This rate almost always matched the extreme rates of the day for that currency.   If the transaction was a buy order, the exchange rate assigned by BNY Mellon to the client's transaction would be the highest rate of the day.   Likewise, if the client was selling, the rate assigned to the trade by BNY Mellon would be the lowest rate of the day.   In short, a SI client's price for an FX trade had no relation to either the prevailing FX rate at the time the transaction was requested or the rate at the time BNY Mellon actually executed the transaction.

76.     In a February 4, 2011 article entitled "Suit Alleges Mellon Created Fake Trades, Overcharged," the *WSJ* provided an example of this FX rate manipulation on a trade conducted on behalf of a Virginia pension fund:



77.     This process of belatedly assigning exchange rates to SI client's FX transactions allowed BNY Mellon to pocket the difference between the high or low exchange rate of the day and the rate at which BNY Mellon actually executed the trade.  Instead of the giving clients the "best rate" or conducting FX transactions under any semblance of "best execution" standards, BNY Mellon carefully determined and selected exchange rates in order to provide the Company with the largest possible illicit profit.  This undisclosed income was earned completely at the expense of the Company's SI clients.  The more volatility there was in the FX market, the greater the spread would be and, therefore, the greater the potential profit would be enjoyed by BNY Mellon.  Thus, during the credit crisis in 2008, when unprecedented volatility occurred in the market, BNY Mellon was able to make tremendous gains by over-charging its clients.  In fact, with SI trades, BNY Mellon was able to markup prices over thirty basis points, compared to only four basis points applied to transparently negotiated trades.

78.     BNY Mellon's SI FX trades were not executed according to "best execution" standards, as defined and understood by both the industry and the Company itself.  As discussed

in ¶¶61-65 above, both BNY Mellon and the industry understood "best execution" to mean the most favorable terms reasonably available under the circumstances.  The Company's actual method for pricing SI client's FX trades was anything but favorable to the client – it charged clients the worst rates and prices artificially assigned for the sole purpose of benefiting BNY Mellon.

79.     The Company has admitted that it did not execute SI transactions according to "best execution" standards.  In a July 26, 2010 e-mail to David K. Nichols ("Nichols"), Managing Director of Global Markets, John Cipriani ("Cipriani") (a BNY Mellon Managing Director), Jorge Rodriguez ("Rodriguez") (Executive Vice-President and Head of Global FX Sales), and others, David G. Green, a BNY Mellon employee, noted that BNY Mellon prices FX trades at "the high and low of the day, *depending on which one is against [the client]*."

80.     Likewise, A.J. Quitadamo ("Quitadamo"), Head of Business Development for Global FX Sales, testified that:

> Q: If I understand what you're saying, it's that Bank of New York Mellon does not do best execution with respect to Standing Instruction trades because it is a counterparty?
>
> A:  My understanding is that Bank of New York Mellon does not have a role in providing best execution.

81.     As demonstrated by the substantial profits BNY Mellon illicitly reaped on each SI trade as a result of the fraudulent scheme, the Company did not provide SI trading "free of charge."  An August 1, 2006 internal e-mail from Nichols, confirms that SI trades were not free of charge.  Nichols stated that "[w]e charge a premium for our services (i.e. we have the audacity to think *we are entitled to a spread on every trade*.  How 1990's is that?)"

**The FX Fraud Was Critical to BNY Mellon's Financial Results**

82.     FX revenue falls under BNY Mellon's Asset Servicing section and is a significant revenue source for the Company.  The Company, in its annual statements, reported $886 million in FX revenue in 2010, $1 billion in 2009, and $1.46 billion in 2008.  These amounts comprised 6.4%, 9.9%, and 10.7% of BNY Mellon's total annual revenue, respectively, in those years.  The vast majority of this FX revenue was derived from SI trades.  Internal BNY Mellon documents show that SI trades, while representing only 12% of total FX trade volume, accounted for 69% of the Company's FX profits in 2009.  By comparison, negotiated FX trades comprised 88% of FX trade volume but accounted for only 31% of BNY Mellon's FX profits.

83.     BNY Mellon enjoyed substantially higher margins on SI trades due to the *post hoc* assignment of the worst FX rates of the day to client's SI trades.  An internal analysis prepared by the Company in 2009, showed that BNY Mellon's margin on SI trades averaged 22.33 basis points.  Conversely, direct FX trades averaged 2.8 basis points and trades placed on the Company's e-commerce platform averaged a mere 1.18 basis points.

84.     These practices are also detailed in the Massachusetts Complaint, the U.S. Attorney Action amended complaint, the Virginia and Florida *qui tam* complaints, and *WSJ* articles.

**BNY Mellon, at the Direction and/or with the Approval of the Individual Defendants, Actively Hid the Fraudulent SI Pricing Scheme to Maintain Its Illicit Profits**

85.     None of the above information regarding SI pricing was disclosed to clients; in fact, it was actively hidden from them.  The Company took a number of steps in the day-to-day operations of the fraudulent scheme to hide the Company's true method of establishing clients' FX rates.  First, BNY Mellon made marginal adjustments to the prices it gave its clients so that clients' prices were not quite the worst rates of the day.  These *de minimis* adjustments were used

to help hide the fraudulent pricing by creating the appearance that trades were priced at the time the trade was actually made, and not after the markets had closed.  Additionally, BNY Mellon deliberately refused to provide SI clients with time-stamped trade order confirmations and internal time-stamped confirmations showing when Company traders actually executed the underlying FX trade.  Indeed, after a SI trade has been executed, the only pricing information that BNY Mellon provided to clients was the final exchange rate assigned.  Finally, BNY Mellon conducted daily calls between its New York and Pittsburgh trading desks to synchronize the high and low ranges for each currency pair.  These reconciliation calls were conducted to ensure that there were no discrepancies between prices offered at the separate desks, thus preventing clients from seeing two different transaction rates for the same currency pair and becoming suspicious.

86.    At the direction of high level management, BNY Mellon actively manipulated a client's SI pricing when they thought a client may or may not be scrutinizing the pricing system. In September 2009, Quitadamo decided to "revert [a client] to traditional SI (internals) pricing" after determining that the client "hadn't hired anyone to specifically trade FX."  If a client was inquiring about the SI pricing or closely monitoring their activity, management routinely switched the inquiring client to an alternative pricing structure rather than face increased scrutiny of the SI pricing system.  When investment manager BlackRock, Inc. ("BlackRock") started to closely examine the Company's SI service and pricing, John Murray ("Murray"), a BNY Mellon Managing Director, feared a "worse-case [sic] scenario" where BlackRock would initiate "a full and thorough review of our FX business."  Murray recommended a proposal to introduce benchmarking standard pricing for BlackRock's SI trades to "protect" BNY Mellon's SI business with BlackRock.  Indeed, BNY Mellon management often switched clients who made detailed

requests to benchmark pricing[1] rather than disclose details of the SI pricing structure.  In July 2007, Nichols directed a BNY Mellon employee responding to a client request for information on SI pricing that, if necessary as a last resort, "we can put the customer on a WM benchmark pricing arrangement."

87.     BNY   Mellon   management   and   employees   also   made   intentional misrepresentations to clients who inquired about details of SI transactions.  By way of example, Paul Park, a Vice President at the Pittsburgh desk, told clients that their bad FX rates were due to "bad timing" of the trade, or a result of the small size of the trade.

**The Highest Levels of Management Were Aware of and Approved of the FX Scheme**

88.     Internal documents confirm that the highest levels of management at BNY Mellon knew about and, at a minimum, tacitly approved of this deceptive scheme.  In a February 2008 e-mail from Rodriguez to defendant Mahoney (the CEO of Global Markets), Rodriguez explained that SI trading is so profitable only because of the lack of transparency with regard to how the Company determines pricing:

> As we all know, Standing Instruction FX is the most profitable form of business. It *offers the traders a free intra-day option to time its currency execution in the marketplace* knowing it does not have to get back to the customer immediately with the deal price. Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges. *All these pricing advantages disappear when* a client trades via an e-commerce platform and *full transparency is achieved*.

89.     Defendant Mahoney repackaged this information to defendant R. Kelly and the Company's then-CFO, Bruce W. Van Saun ("Van Saun"), in an e-mail on February 1, 2008.  In

---

[1] Benchmark pricing involves agreeing to conduct an FX transaction for a specific number of basis points above a particular benchmark rate for any given day for each SI transaction. Benchmarking as an alternative pricing instruction for SI clients was not advertised, and it was offered only when a client complained or inquired about details of the SI pricing system.

the e-mail, Mahoney explained: "Standing instruction also offers the traders a free intra-day option to time the currency execution in the marketplace *knowing we don't have to get back to the customer immediately with the deal price*. Business of this type also allows us to take advantage of increased market volatility and wide intra-day trading ranges."

90.     In 2008, the Company created a "Revenue/Fee Disclosure Team" to consider whether BNY Mellon should be more honest with its clients regarding pricing.  As part of that consideration, Antonio Garcia-Meitin, a BNY Mellon employee, sent an e-mail to Executive Vice-President Rodriguez, Robert Near, Managing Director of BNY Mellon's Global Markets, and the rest of the Revenue/Fee Disclosure Team, specifically noting that *"[i]n general transparency adversely impacts our revenue stream* and *any product to distribute fee information would hurt us many times over in reduced revenue. Nothing like a rock and a hard place*."

91.     Additionally, Company documents reveal that the Company's fiduciaries knew that transparency and client knowledge of pricing would destroy BNY Mellon's FX profits and pricing advantages.  In his February 2008 e-mail to defendant R. Kelly and CFO Van Saun, defendant Mahoney went on to explicitly brief the CEO and CFO on how "full transparency" with BNY Mellon's SI clients would hurt business: "*[A]ll these pricing advantages disappear when* a client trades via an e-commerce platform and *full transparency is achieved (comparison pricing, execution, and confirmation in real time)*." An October 28, 2009 e-mail from Cipriani likewise observed that "[o]nce pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero."

92.     Former employees at BNY Mellon have confirmed that this FX scheme was approved and directed from the top down.  As detailed in *Commonwealth of Virginia, ex rel. FX*

*Analytics v. The Bank of New York Mellon Corporation* (the "Virginia Action"), a letter from a former employee at the Company's Pittsburgh currency trading desk revealed that BNY Mellon's "deceptive practices reflected a ***well thought-out scheme emanating from the highest reaches of [BNY Mellon's] senior management***," who "***were aware of and participated in the deception***."

93.     Management's reaction to the October 20, 2009 unsealing of the California AG's action against a competitor custodian bank, State Street Bank & Trust Co. ("State Street"), provided further insight into management's knowledge of the illegality of BNY Mellon's SI pricing.  In the State Street action, the California AG alleged that State Street, like BNY Mellon, had systematically overcharged pension funds for their FX transactions.  Tellingly, just after news of the State Street lawsuit was reported by *Reuters*, BNY Mellon's Director of FX Trading, William Samela, forwarded the *Reuters* report to all BNY Mellon FX sales employees with the subject line "*Oh No*."  That same day, Robert Donelan, a former employee at BNY Mellon, emailed his former colleagues an article about the State Street lawsuit and wrote: "***[W]ell is the 'Game' over? … Time to retire after raping the custodial accounts, all 'Public Trust' money?***"

94.     Although BNY Mellon management recognized that the Company's SI clients would react to the State Street lawsuit and question BNY Mellon's FX pricing, the Individual Defendants did nothing to fix the Company's fraudulent scheme.  Following the news of the State Street action, a BNY Mellon Executive Vice-President e-mailed all senior personnel involved with FX transactions to advise them of the State Street suit and directed them to "[p]ut a team together to examine our practices….  ***Assume disposition of this case will shine a light on [SI] FX and best execution practices***."  In response, Quitadamo proposed that the Company "be a leader in price transparency" and "fully disclos[e] a pricing schedule" to clients by providing "a

defined margin above a benchmark."  He went on to explain that BNY Mellon, by "understand[ing] current volume distribution and then determin[ing] what the margin scale would have to look like" could still "achieve current overall margin (20 [basis points] or so)."

95.    The Individual Defendants, however, ultimately rejected a move towards transparency because it was much more profitable to mislead clients and keep them in the dark about how SI transactions were priced.  Cipriani stated in an October 28, 2009 e-mail that he did "NOT like" the idea of providing pricing information to clients, believing that such disclosure would hurt FX profits because "[o]nce pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero."

**IMPROPER STATEMENTS**

96.    As explained above, due to the Individuals Defendants' action (and conscious inaction), BNY Mellon realized significant illegal and improper profits from manipulating its clients by charging them less favorable currency exchange rates than BNY Mellon was actually charged.  To conceal this practice, BNY Mellon, at the direction and/or with the approval of the Individual Defendants, not only lied to clients, but also to the Company's investors.

97.    The Individual Defendants repeatedly issued improper statements that failed to disclose that BNY Mellon had engaged and was engaging in a systematic business practice of overcharging clients for FXs.

98.    In a press release issued by BNY Mellon on October 18, 2007, BNY Mellon reported FX trading and "other trading" revenue of $238 million for third quarter 2007, up 74% year-over-year reflecting "higher client volumes, as well as a significant increase in currency volatility and a higher valuation of the credit derivatives portfolio."

99.    Also on October 18, 2007, BNY Mellon held a 2007 earnings conference call, during which defendant Hassell made the following improper statements: