UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

BANK OF NEW YORK MELLON CORP.
FOREX TRANSACTIONS LITIGATION

                                MASTER DOCKET
                                12 MD 2335 (LAK)

This document relates to:

*In re The Bank of New York Mellon Corporation
Shareholder Derivative Litigation*, 11 Civ. 8471 (LAK).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

      Brian J. Robbins
      Felipe J. Arroyo
      Shane P. Sanders
      Gina Stassi
      ROBBINS ARROYO LLP

      *Attorneys for Plaintiffs*

      Reid M. Figel
      Rebecca A. Beynon
      Andrew E. Goldsmith
      KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL,
      P.L.L.C.

      *Attorneys for Nominal Defendant The Bank of New
      York Mellon Corporation*

      Lawrence Portnoy
      Lindsey T. Knapp
      Bryan McArdle
      DAVIS POLK & WARDWELL LLP

      *Attorneys for the Individual Defendants*

LEWIS A. KAPLAN, *District Judge.*

Plaintiffs bring this consolidated shareholder derivative action against current and former officers and directors of the Bank of New York Mellon Corporation ("BNY Mellon Corp" or the "Company"). The complaint alleges that these individual defendants are liable in connection with the foreign exchange standing instruction service of the Company's subsidiary, Bank of New York Mellon ("BNY Mellon"). Based on the same underlying allegations, this Court has held that one of BNY Mellon's customers adequately pled claims of breach of contract and breach of fiduciary duty[1] and that the United States adequately pled, in certain respects, a claim that BNY Mellon and one of its employees committed mail and wire fraud.[2]

Defendants move to dismiss, contending that plaintiffs were obligated to make a demand on the Company's board to pursue the action in its own right. Plaintiffs argue that a demand would have been futile because the directors consciously allowed the alleged misconduct to occur. In the last analysis, this case is a "replay of other similar cases where the plaintiff failed to allege with particularity any facts from which it could be inferred that particular directors knew or should have been on notice of alleged [misconduct], and any facts suggesting that the board knowingly allowed or participated in a violation of law."[3] The motion is granted.

---

[1] *Se. Pa. Transp. Auth. v. Bank of New York Mellon Corp.*, --- F. Supp.2d ----, 2013 WL 440628 (S.D.N.Y. Jan. 23, 2013) ("*SEPTA*").

[2] *United States v. Bank of New York Mellon*, --- F. Supp.2d ----, 2013 WL 1749418 (S.D.N.Y. Apr. 24, 2013) ("*DOJ*").

[3] *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008).

2

*Background*

The Court assumes familiarity with its prior opinions that lay out the principal allegations against BNY Mellon and the Company.[4] In brief, plaintiffs allege that BNY Mellon deceived its customers from 2000 to 2011 about the nature of its standing instruction service for foreign exchange trading.[5] In standing instruction ("SI") trading, BNY Mellon automatically converted its customers' funds from one currency to another as such needs arose, informing the customer of the executed price only after the fact.[6] It described the service, among other things, as providing "best execution."[7] Plaintiffs in this and other actions have alleged, however, that this term had an industry meaning inconsistent with the Bank's actual pricing practices.[8] These practices, which were not disclosed to customers, were to price the trades at or near the least favorable interbank market rate of a given trading day.[9] SI trading was highly profitable for BNY Mellon and the Company, as its margins well exceeded those of directly negotiated FX transactions.[10]

Without making demand on the board, plaintiffs Iron Workers Mid-South Pension Fund and Marilyn Clark filed separate derivative complaints on November 22, 2011 and December

---

[4] See *DOJ*, 2013 WL 1749418 at *2–*6; *SEPTA*, 2013 WL 440628 at *1–*6.

[5] AC ¶¶ 3–4.

[6] *Id.* ¶¶ 63–64.

[7] *Id.* ¶¶ 68–70.

[8] *Id.* ¶ 67.

[9] *Id.* ¶¶ 80–81, 91.

[10] *Id.* ¶¶ 88–89.

3

2, 2011, respectively, purportedly on behalf of the Company.[11]  The cases were consolidated and then transferred to this Court by the Judicial Panel on Multidistrict Litigation.  Plaintiffs filed their consolidated complaint on June 15, 2012,[12] and then filed an amended consolidated complaint ("AC") on January 31, 2013, at this Court's invitation.[13]

The AC brings claims of breach of fiduciary duty, corporate waste, and unjust enrichment against current and former members of the Company's management, including chief executive officer and chairman of the board Gerald L. Hassell,[14] and against twelve current or former non-management directors (the "Outside Directors").[15]  The AC alleges that the defendants breached their duties to the Company by pursuing illicit short-term profits through the SI pricing scheme even though they knew, recklessly disregarded, or were grossly negligent in not knowing that those practices "were illegal, violated the Company's fiduciary duties, and/or exposed the Company to financial and reputational risks."[16]  The AC alleges further that defendants committed

---

[11] *See In re: The Bank of New York Mellon Corp. S'holder Derivative Litig.*, No. 11 Civ. 8471, Dkt. 1; *see also Clark v. Hassell*, No. 11 Civ. 8810, Dkt. 1.

[12] DI 120.

[13] DI 196.

[14] The other members of management that are defendants in this action are Thomas P. Gibbons, Arthur Certosimo, James P. Palermo, Robert Kelly, and Richard Mahoney. AC ¶¶ 20–24, 36–37.

[15] The Outside Directors include Wesley W. von Schack, Catherine A. Rein, Richard J. Kogan, William C. Richardson, Samuel C. Scott III, Michael J. Kowalski, John A. Luke, Jr., Mark A. Nordenberg, Nicholas M. Donofrio, Ruth E. Bruch, Edmund F. Kelly, and John P. Surma.  *Id.* ¶ 162.  Surma left the board before the filing of the instant amended complaint.  *Id.*

[16] *Id.* ¶ 186.

4

corporate waste by paying compensation to the officers and directors that breached their duties[17] and are liable for unjust enrichment because they received compensation while breaching their duties.[18]

*Discussion*

I.   Governing Law

Under Delaware law,[19] the demand requirement is a "substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise."[20] Demand is not necessary, however, when it would be futile. Delaware law provides two principal tests for demand futility.

First, when a claim involves "a contested transaction *i.e.,* where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties," then under the *Aronson* test, plaintiff must allege "particularized facts creating a reason to doubt that (1) the directors are disinterested and independent or that (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[21] Under the business judgment rule, courts presume "that in making a business decision[,] the directors of a corporation acted on an informed

---

[17]   *Id.* ¶ 192.

[18]   *Id.* ¶ 196.

[19]   The parties agree that the law of the state of incorporation—here, Delaware—governs the standard for assessing demand futility. *Scalisi v. Fund Asset Mgmt, L.P.*, 380 F.3d 133, 138 (2d Cir. 2004).

[20]   *Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006) (internal quotation marks omitted).

[21]   *Wood*, 953 A.2d at 140 (footnotes and internal quotation marks omitted).

basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."[22]  The rule protects the actions of disinterested directors who inform themselves of all material information reasonably available to them prior to making the decision and then do not act with gross negligence.[23]

Second, when the suit regards "not a business decision of the Board but rather a violation of the Board's oversight duties," then the *Rales* test "requires that the plaintiff allege particularized facts establishing a reason to doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[24]

This derivative complaint is governed also by Fed. R. Civ. P. 23.1, which requires a complaint to "'state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and . . . the reasons for not obtaining the action or not making the effort.'"[25]

The Court addresses first the breach of fiduciary duty claim and then considers the corporate waste and unjust enrichment claims.[26]

---

[22]   *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *see also Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1082 (Del. 2011) ("The entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." (internal quotation marks and alterations omitted)).

[23]   *Aronson*, 473 A.2d at 812.

[24]   *Wood*, 953 A.2d at 140 (footnotes and internal quotation marks omitted).

[25]   *Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009) (quoting Fed. R. Civ. P. 23.1).

[26]   *Loveman v. Lauder*, 484 F. Supp.2d 259, 266 (S.D.N.Y. 2007) (recognizing that demand futility should be assessed claim-by-claim, and that relevant test may vary by claim).

## II.     Breach of Fiduciary Duty

Plaintiffs advance three theories for excusing demand with regard to their breach of fiduciary duty claims. First, they contend that demand is excused under the second prong of *Aronson* because the board was aware of the allegedly fraudulent scheme but consciously chose not to prevent the scheme from continuing.[27] Second, they assert that the directors could not consider a demand impartially because they face a substantial threat of personal liability for false and misleading statements made in Company financials.[28] Finally, they argue that the board already has showed its hostility to the allegations through its public actions, making any demand futile.[29]

The Court considers each of plaintiff's theories in turn.

### A.     Business Judgment

Defendants first maintain that demand is not excused under *Aronson*'s second prong because the allegations do not support an inference that the directors were aware of any fraudulent conduct.[30]

To assess whether the complaint adequately alleges that defendants were aware of

---

[27] Opp. 11–27.

[28] Opp. 27–29.

[29] Opp. 31–33.

[30] Defendants more broadly challenge plaintiff's reliance on *Aronson* altogether, contending that plaintiffs' claim amounts to an oversight claim that should be analyzed under *Rales*. *But see In Re Abbott Laboratories Deriv. Shareholders Litig.*, 325 F.3d 795, 805–7 (7th Cir. 2003) (distinguishing between "unconsidered failure to act" due to poor oversight mechanisms that would be subject to *Rales* and "conscious inaction" that would be subject to *Aronson*). Because plaintiffs' claim fails even under their own chosen standards, the Court need not address this dispute.

the alleged fraudulent scheme, one must be clear about what precisely may have been fraudulent about it. This Court repeatedly has made clear that BNY Mellon's pricing methodology and its failure to provide transparency, in and of themselves, did not constitute fraud and were not otherwise wrongful.[31] Rather, it has sustained prior complaints only insofar as they have alleged that BNY Mellon actively *misled* its customers about the nature and quality of the services that it was providing—most notably, by stating that the service provided best execution.

Thus, the Court may assume *arguendo* that the AC adequately alleges that the board was aware (1) of BNY Mellon's "technical pricing operations" including its practice of "pric[ing] FX trades at the high and low of the day, depending on which one is against the client," (2) of BNY Mellon's "policy of not disclosing its SI practices to clients," (3) "of the importance of the SI pricing practices to the [Company's] overall profitability," and (4) of the facts that "BNY [Mellon]'s management believed that the Company's SI pricing system was similar to State Street's SI pricing system, and had begun evaluating BNY [Mellon]'s practices in the wake of the lawsuit against State Street."[32] This claim fails notwithstanding these generous assumptions.

---

[31] *DOJ*, 2013 WL 1749418 at *30; *SEPTA*, 2013 WL 440628 at *18 n.186. The AC contains no allegations warranting a different conclusion here.

[32] Opp. 17–19; *see generally* AC ¶¶ 94–102 (setting forth allegations that senior management understood that standing instruction trading was profitable because of lack of price transparency)

The AC alleges that in October 2009, an action was unsealed charging State Street Bank & Trust Co. with "systematically overcharg[ing] pension funds for their FX transactions." AC ¶ 100. The AC alleges that current and former Bank employees expressed dismay at this news and that an executive vice president emailed senior personnel to direct them to "put a team together to examine our practices" and to "[a]ssume disposition of this case will shine a light on SI FX and best execution practices." *Id.* ¶ 101. The AC alleges that the board "received reports regarding these matters because they concerned the Company's own compliance with laws and regulations." *Id.*

8

The fundamental problem is that the AC fails to allege that the board, prior to 2011, was aware of facts indicating that BNY Mellon was acting wrongfully—i.e., that they were aware that the Bank was *misrepresenting* the nature and quality of its services to its customers.[33] The AC does not allege that any emails or reports, including any relating to the State Street litigation, informed the board about how the Company represented its services or indicated that these representations were inaccurate.[34] Moreover, there are no alleged "red flags" that could permit the conclusion that the board was grossly negligent in failing to learn how the Company was representing its services before "deciding" not to act.[35] Thus, the AC does not allege sufficient facts with particularity to create a reasonable doubt that the board's inaction was a valid exercise of business judgment.

To be sure, once lawsuits against the Company were unsealed or filed over the course of 2011, the board surely had a basis for being aware of the alleged misrepresentations. But it would eviscerate the demand requirement to conclude that, once the facts come to light, demand is excused

---

[33] To whatever extent such knowledge may be imputed to Hassell as a member of management, plaintiffs do not dispute that they must show that *Aronson* is satisfied with respect to at least half of the directors. Opp. 11 (citing *Conrad v. Blank*, 940 A.2d 28, 36 (Del. Ch. 2007)). The Court thus focuses its attention on the Outside Directors.

[34] The AC is silent as to the nature of the overlap between the practices of State Street and BNY Mellon. In any event, it does not appear that "best execution" or other misrepresentations at issue in this case were involved specifically in the State Street cases. *Cf. Hill v. State Street Corp.*, No. 09 Civ. 12146 (NG), 2011 WL 3420439, *10–*12 (D. Mass Aug. 3, 2011).

[35] *See Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 66 (Del. 1989) (assessing whether board decision was informed under gross negligence standard); *Wood*, 953 A.2d at 143 (noting that "red flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer" (internal quotation marks omitted)).

9

simply because the board had not acted before shareholder suits began.[36] The requirement's purpose is to ensure that the board is provided with an express opportunity to make the appropriate decision in the first instance.

### B. *Misleading Statements*

Alternatively, plaintiffs contend that demand is excused because the Outside Directors face a "substantial likelihood of personal liability"[37] due to their allegedly false and misleading statements.[38] Almost none of the statements upon which plaintiffs rely, however, are alleged to have been made, reviewed, or approved by the Outside Directors.[39] The only statements even remotely connected to the Outside Directors are those contained in the Company's financial statements or earnings press releases that they approved.[40] But, even as to these statements, the AC does not "allege facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions."[41] Rather, it alleges only that

---

[36] *See In re INFOUSA, Inc. S'holder Litig.*, 953 A.2d 963, 987 (Del. Ch. 2007) ("Mere inaction on the part of the board . . . does not relieve plaintiffs of the requirement to make demand.").

[37] *Wood*, 953 A.2d at 141 n.11 (citing *Aronson*, 473 A.2d at 814) (internal quotation marks omitted).

[38] Again, the Court need not consider Hassell because plaintiffs do not dispute that they must allege that at least half of the directors are incapable of considering a demand. Opp. 11.

[39] *See generally* AC ¶¶ 103–33 (setting forth allegedly improper statements).

[40] *Id.* ¶ 133.

[41] *In re Citigroup, Inc. S'holder Derivative Litig.*, 964 A.2d 106, 134 (Del. Ch. 2009).

10

the "financial statements contained false statements and material omissions and that the director defendants reviewed" them.[42] This is insufficient.[43]

    C.    *Antagonism to Claims*

Finally, plaintiffs allege that the board has shown its hostility to the claims through a purported public campaign to discredit the allegations and that demand therefore would be futile.[44] This point merits no discussion. The AC cites to statements by *management*, and alleges no facts by which these statements may be attributed to the board.[45] The AC fails to allege any basis for futility in these circumstances.

---

[42] *Id.*

[43] *Id.* ("Pleading that the director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand"); *see also Wood*, 953 A.2d at 142 (suggesting that there is no substantial threat of personal liability when, *inter alia*, the complaint is "devoid of any pleading regarding the full board's involvement in the preparation and approval of the company's financial statements" (internal quotation marks omitted)).

[44] *See generally* AC ¶¶ 134–48 (discussing public revelations of Company's practices). The AC does allege that director Edmund Kelly made statements on an April 2011 earnings call suggesting that some of the reporting on the Company's FX practices was misleading and inaccurate. *Id.* ¶ 139. Defendants contend that the statement was actually made by then-CEO Robert Kelly, citing a transcript of the call indicating as such. *See* Portnoy Decl., Ex. 3. Plaintiffs' opposition does not dispute defendants' contention.

[45] Moreover, even assuming the statement purportedly made by Edmund Kelly is attributed to him, the Court concludes that this statement alone is not sufficient to render demand futile.

This case is distinguishable from the authorities plaintiffs cite, wherein it appears that the respective boards themselves took meaningful actions casting doubt on the merits of the litigation prior to the suit. *See, e.g.*, *Biondi v. Scrushy*, 820 A.2d 1148, 1163 (Del. Ch. 2003); *Conrad v. Blank*, 940 A.2d 28, 37–38 (Del Ch. 2007).

11

### III. Corporate Waste and Unjust Enrichment Claims

As plaintiffs concede, the unjust enrichment and corporate waste claims are "inexorably linked" to the breach of fiduciary duty claim.[46] They argue only that defendants committed corporate waste in compensating those who were breaching their fiduciary duties and that the recipients of that compensation were unjustly enriched by receiving payment while breaching their duties.

Plaintiffs have not alleged that the board was aware of wrongful activity. They therefore have not alleged facts giving rise to a reasonable doubt that the decision to pay allegedly wrongdoing officers was a valid exercise of business judgment.[47] For similar reasons, plaintiffs have failed to allege that demand should be excused as to the alleged unjust enrichment of any members of management. And with regard to claims of unjust enrichment as to the Outside Directors, the claim fails on the merits—plaintiffs have not adequately alleged that the Outside Directors were not entitled to the compensation that they received.[48]

---

[46] Opp. 29.

[47] See Brehm, 746 A.2d at 263 (noting limited circumstances in which corporate waste claim may lie).

[48] See Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010) (setting forth elements of unjust enrichment claim).

12

*Conclusion*

For the foregoing reasons, defendants' motion [DI 216] is granted.

SO ORDERED.

Dated:         July 2, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)